No. 23-2101

# United States Court of Appeals
# for the Fourth Circuit

UNITED STATES EX REL. LISA WHEELER;
STATE OF NORTH CAROLINA EX REL. LISA WHEELER

Plaintiffs – Appellants,

v.

ACADIA HEALTHCARE COMPANY, INC.; CRC HEALTH, LLC;
ATS OF NORTH CAROLINA, LLC, d/b/a Mountain Health Solutions
Asheville, d/b/a Asheville Comprehensive Treatment Center, d/b/a
Mountain Health Solutions North Wilkesboro, d/b/a North Wilkesboro
Comprehensive Treatment Center

Defendants – Appellees.

Appeal from the United States District Court
for the Western District of North Carolina

## APPELLANT'S OPENING BRIEF

Gary W. Jackson
Kaitlyn E. Fudge
LAW OFFICES OF JAMES SCOTT FARRIN
555 S. Mangum St., Suite 800
Durham, NC 27701
Tel. (919) 688-4991

Willian N. Nettles
Frances C. Trapp
John L. Warren III
LAW OFFICE OF BILL NETTLES
2008 Lincoln St.
Columbia, SC 29201
Tel. (803) 814-2826

Tejinder Singh
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel. (202) 629-3530
tejinder.singh@sparacinopllc.com

*Attorneys for Plaintiffs - Appellants*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-2101__          Caption: __United States ex rel. Lisa Wheeler v. Acadia Healthcare Co., Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Lisa Wheeler__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☑YES ☐NO
   If yes, identify all such owners:
   Appellees CRC Health, LLC and ATS of North Carolina, LLC have identified Acadia Healthcare Company, Inc. as a publicly held corporation that owns 10% or more of the stock of a party.

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/Tejinder Singh                Date: January 12, 2024

Counsel for: Appellant Lisa Wheeler

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ...........................................................4

STATEMENT OF ISSUES........................................................................4

STATEMENT OF THE CASE....................................................................6

SUMMARY OF ARGUMENT ..................................................................21

ARGUMENT ...........................................................................................27

   I.  The Complaint Pleads Fraudulent Inducement by Alleging That Defendants Knowingly Falsified Their Compliance With Federal Opioid Treatment Standards to Obtain Eligibility to Treat Government Beneficiaries for Opioid Use Disorder ...........27

   II.  The Complaint Pleads Implied False Certification by Alleging That Defendants Presented Claims for Opioid Treatment Knowing That They Were Violating Material Requirements Governing Such Treatment.........................................................39

   III. The Complaint Pleads the Presentment of False Claims and the Use of False Records by Alleging That Defendants Billed the Government for Therapy Services That Were Not Provided as Billed, and Falsified Therapy Notes to Substantiate Those False Claims .................................................................46

   IV. The Foregoing Allegations Satisfy Federal Rule of Civil Procedure 9(b)................................................................48

   V.  The Complaint Pleads Reverse False Claims by Alleging That Defendants Knowingly Concealed and Avoided Their Obligations to Pay Money Due Under Their Corporate Integrity Agreement........................................................62

CONCLUSION ........................................................................................68

STATEMENT REGARDING ORAL ARGUMENT.................................68

# TABLE OF AUTHORITIES

## Cases

*Foisie v. Worcester Polytechnic Inst.*,
  967 F.3d 27 (1st Cir. 2020).................................................................54

*Harrison v. Westinghouse Savannah River Co.*,
  176 F.3d 776 (4th Cir. 1999) ....................................................... 27, 48

*In re Baycol Prod. Litig.*,
  732 F.3d 869 (8th Cir. 2013) ..........................................................28

*Marsteller ex rel. United States v. Tilton*,
  880 F.3d 1302 (11th Cir. 2018) .....................................................28

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).........................................................................33

*Ruscher v. Omnicare Inc.*,
  2014 WL 4388726 (S.D. Tex. Sept. 5, 2014).........................................66

*United States ex rel. Badr v. Triple Canopy, Inc.*,
  775 F.3d 628 (4th Cir. 2015) ....................................................... 33, 37

*United States ex rel. Bahrani v. Conagra, Inc.*,
  465 F.3d 1189 (10th Cir. 2006) ........................................................67

*United States ex rel. Boise v. Cephalon, Inc.*,
  2015 WL 4461793 (E.D. Pa. July 21, 2015).........................................66

*United States ex rel. Campie v. Gilead Scis., Inc.*,
  862 F.3d 890 (9th Cir. 2017) ...........................................................28

*United States ex rel. Chorches v. Am. Med. Response, Inc.*,
  865 F.3d 71 (2d Cir. 2017)...............................................................54

*United States ex rel. Colquitt v. Abbott Labs.*,
  858 F.3d 365 (5th Cir. 2017) ...........................................................56

*United States ex rel. Escobar v. Universal Health Servs., Inc.*,
  842 F.3d 103 (1st Cir. 2016).............................................................34

*United States ex rel. Grant v. United Airlines Inc.*,
  912 F.3d 190 (4th Cir. 2018) .................................................. 49, 50, 58

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) ..................................................... 55, 56, 59

*United States ex rel. Harrison v. Westinghouse Savannah River Co.*,
352 F.3d 908 (4th Cir. 2003) ...................................................................32

*United States ex rel. Heath v. AT&T, Inc.*,
791 F.3d 112 (D.C. Cir. 2015) ................................................................60

*United States ex rel. Hendow v. Univ. of Phx.*,
461 F.3d 1166 (9th Cir. 2006) ................................................................28

*United States ex rel. Lemon v. Nurses To Go, Inc.*,
924 F.3d 155 (5th Cir. 2019); ................................................................34

*United States ex rel. Lisitza v. Johnson & Johnson*,
765 F. Supp. 2d 112 (D. Mass. 2011).....................................................37

*United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*,
707 F.3d 451 (4th Cir. 2013) .............................................................55, 56

*United States ex rel. Nicholson v. MedCom Carolinas, Inc.*,
42 F.4th 185 (4th Cir. 2022)..............................................................48, 53

*United States ex rel. Polukoff v. St. Mark's Hosp.*,
895 F.3d 730 (10th Cir. 2018) ...........................................................46, 54

*United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*,
892 F.3d 822 (6th Cir. 2018) ..................................................................34

*United States ex rel. Rose v. Stephens Inst.*,
909 F.3d 1012 (9th Cir. 2018) ................................................................34

*United States ex rel. Silingo v. WellPoint, Inc.*,
904 F.3d 667 (9th Cir. 2018) ..................................................................46

*United States ex rel. Taylor v. Boyko*,
39 F.4th 177 (4th Cir. 2022)...................................................................48

*United States ex rel. Thayer v. Planned Parenthood of the Heartland*,
765 F.3d 914 (8th Cir. 2014) ..................................................................60

*United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless, LLC*,
34 F.4th 29 (D.C. Cir. 2022) ..................................................................32

*United States v. Bourseau*,
   531 F.3d 1159 (9th Cir. 2008) ................................................32

*United States v. Gaudin*,
   515 U.S. 506 (1995) ..............................................................33

*United States v. Molina Healthcare of Ill., Inc.*,
   17 F.4th 732 (7th Cir. 2021).........................................*passim*

*United States v. Strock*,
   982 F.3d 51 (2d Cir. 2020)................................................ 28, 32

*United States v. Triple Canopy, Inc.*,
   857 F.3d 174 (4th Cir. 2017) ................................... 33, 44, 45

*United States v. United Healthcare Ins. Co.*,
   848 F.3d 1161 (9th Cir. 2016) ............................................54

*United States v. Walgreen Co.*,
   78 F.4th 87 (4th Cir. 2023)..............................27, 32, 33, 37

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
   579 U.S. 176 (2016)........................................................*passim*

## Statutes

28 U.S.C. § 1331 ..........................................................................4

28 U.S.C. § 1367 ..........................................................................4

31 U.S.C. § 3729 ..........................................................................1

31 U.S.C. § 3729(a)(1)(A) .........................................................47

31 U.S.C. § 3729(a)(1)(B) .........................................................47

31 U.S.C. § 3729(a)(1)(G) ................................................... 62, 66

31 U.S.C. § 3729(b)(1) ...............................................................63

31 U.S.C. § 3729(b)(3) ................................................... 26, 62, 65

31 U.S.C. § 3729(b)(4) ...............................................................31

## Regulations

42 C.F.R. § 410.67(d) ........................................................................8

42 C.F.R. § 410.67(d)(3) ...................................................................9

42 C.F.R. § 8.11(a)(2) .......................................................................7

42 C.F.R. § 8.11(b)(6) .......................................................................7

42 C.F.R. § 8.11(f)(1) ........................................................................7

42 C.F.R. § 8.11(f)(7) ..................................................................7, 29

42 C.F.R. § 8.12 ..............................................................................40

42 C.F.R. § 8.12(a) .....................................................................29, 35

42 C.F.R. § 8.12(f)(1) ..................................................................8, 29

42 C.F.R. § 8.12(f)(4) ........................................................................8

42 C.F.R. § 8.12(f)(5) ..................................................................29, 42

42 C.F.R. § 8.12(f)(5)(i)...................................................8, 10, 35, 43

42 C.F.R. § 8.12(g)(1).................................................................8, 29

42 C.F.R. § 8.13 .................................................................................7

42 C.F.R. § 8.14 .................................................................................7

## Rules

Fed. R. Civ. P. 9(b) ................................................................*passim*

## Other Authorities

84 Fed. Reg. 62568-01 (Nov. 15, 2019).......................................10

S. Rep. No. 111-10 (2009)........................................................65, 67

S. Rep. No. 99-345 (1986)........................................................28, 46

# INTRODUCTION

This is a case under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, and its North Carolina counterpart, at the pleading stage. These statutes protect government programs from fraud and abuse by empowering private parties who learn of wrongful conduct that financially harms the government to bring a civil action to redress that harm.

Defendants operate treatment programs for individuals diagnosed with opioid use disorder. These addiction-treatment programs receive substantial funds from the government, which regards ending the opioid epidemic as a high priority. Because these programs distribute controlled substances like methadone, which are designed to help patients avoid using more dangerous illicit opioids, the programs are also tightly regulated. Among other features, the government requires opioid treatment programs to provide clinically adequate substance abuse counseling and therapy to treat the root causes of patients' addictions, thus preventing relapse.

Beginning in September 2020, defendants provided almost no therapy to their patients. Thus, defendants ceased providing in-person therapy, and generally limited therapeutic interactions to short phone calls—

1

when they occurred at all. Making matters worse, defendants created false notes documenting in-person or videoconference therapy sessions that never happened. The upshot is that defendants distributed drugs like methadone to their patients without taking meaningful action to address those patients' underlying addictions—covertly transforming themselves from addiction-treatment centers to addiction enablers.

Plaintiff Lisa Wheeler is the former assistant medical director of defendants' facility in Asheville, North Carolina. She personally observed this misconduct and heard from the medical director of another facility that the same was occurring there, too. Hoping to resolve the matter internally, Wheeler and her colleague reported the problem to the clinic directors at their respective facilities, but the use of falsified therapy notes continued pursuant to corporate-wide policy. Defendants thus brazenly disregarded the federal opioid treatment standards, but billed the government as if they were in compliance.

This was not defendants' first violation. In 2019, several defendants entered into a Corporate Integrity Agreement (CIA) with the government as part of a resolution of previous allegations that they submitted false claims to government healthcare programs. The CIA imposes substantial

compliance and reporting obligations, backed by stipulated penalties for violations. Defendants shirked those obligations by disregarding Wheeler's reports and instead perpetuating the fraud.

After her efforts to address defendants' misconduct internally failed, Wheeler brought this whistleblower action alleging that defendants knowingly claimed money from government healthcare programs that they should not have claimed, and knowingly and unlawfully avoided obligations to pay money under the CIA. On defendants' motion, the district court dismissed Wheeler's complaint, holding that even if defendants billed the government for opioid treatment without providing any meaningful therapy or counseling services, their claims were not materially false, and that the complaint failed for lack of particularity.

Respectfully, this was error. Defendants knowingly disregarded core program requirements, provided fatally flawed services, and violated their CIA, all while billing the government as if they had provided a fully compliant suite of services. Defendants' egregious violations jeopardized the lives of vulnerable Americans who depend on government healthcare programs. These are paradigmatic false claims, and the judgment below should be reversed.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331, and pendant jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims arise under the same facts and raise functionally identical legal issues.[1] The district court dismissed all of Wheeler's claims and entered judgment for defendants on September 18, 2023. JA272. Wheeler timely appealed on October 16, 2023. JA273.

## STATEMENT OF ISSUES

The question on appeal is whether the district court correctly concluded that the complaint fails to plead violations of the False Claims Act with plausibility and particularity. This encompasses multiple sub-issues, including:

1. Whether the complaint pleads that defendants fraudulently induced the government to allow them to provide opioid treatment.

2. Whether the complaint pleads that defendants' claims falsely implicitly certified their compliance with material federal

---

[1] The parties and district court agreed below that the federal and state statutes apply identical standards. *See* JA243. For simplicity's sake, this brief focuses on the federal claims—but the analysis applies similarly to the state claims with respect to claims for state funds.

requirements for opioid treatment programs, including providing clinically necessary therapy services and keeping adequate records.

3. Whether the complaint pleads that defendants presented false claims for therapy services and made or used false records material to those claims.

4. Whether the complaint pleads fraud with sufficient particularity.

5. Whether the complaint pleads that defendants knowingly avoided their obligations under the corporate integrity agreement to pay money to the government.

## STATEMENT OF THE CASE

Defendants compose a corporate family that provides treatment for opioid use disorder nationwide, including in North Carolina.[2] Specifically, defendants provide "Medication-Assisted Treatment" (MAT), which involves the use of medications such as methadone in combination with counseling and therapy to help patients overcome opioid addiction. JA11. The medicines salve the chemical effects of opioid addiction, while therapy helps address the myriad medical, psychological, and other personal issues that drive addiction. JA91. The combination of medicine and other treatment is critical to long-term success: If a patient addicted to opioids merely receives a steady stream of narcotics, but no additional treatment, it becomes more likely that the patient will relapse. JA91.

---

[2] Defendant Acadia Healthcare Company, Inc., "is one of the largest providers of behavioral healthcare services and addiction treatment in the United States." JA19. It receives approximately 65% of its annual income from Medicare and Medicaid. JA21. Acadia owns defendant CRC Health, LLC, which it acquired in 2014. JA22. CRC specializes in addiction treatment services and mental health services. JA22. CRC, in turn, owns addiction treatment centers, including defendant ATS of North Carolina, LLC, an operating company for Acadia and CRC. JA24. ATS operates substance abuse treatment facilities in cities across North Carolina. JA24.

Opioid treatment programs are regulated at multiple levels.[3] To operate an opioid treatment program, a provider must be certified by the Substance Abuse and Mental Health Services Administration (SAMHSA). JA12. To obtain certification, an applicant must certify that it will "operate in accordance with Federal opioid treatment standards and approved accreditation elements." 42 C.F.R. § 8.11(b)(6), (f)(7). Opioid treatment programs must also be accredited by organizations designated by SAMHSA, which may impose additional requirements. *Id*. § 8.11(a)(2). State laws impose additional requirements—and compliance with those is likewise a condition of certification. *See id*. § 8.11(f)(1). Programs that fail to follow the federal opioid treatment standards may lose their certification or accreditation. *See id*. §§ 8.13, 8.14.

---

[3] Opioid treatment takes multiple forms. JA33. Opioid treatment programs, or OTPs, are the only programs permitted to administer methadone, the most potent and potentially addictive drug used for opioid use disorder treatment. *See* JA33. OTPs are subject to the federal regulations discussed in the text. JA38, JA52. Another treatment is office-based opioid treatment, or OBOT, under which physicians or other advanced practitioners can administer drugs other than methadone. *See* JA11, JA35. OBOT is not subject to the same federal standards—but all forms of opioid treatment are also regulated at the state level. *See* JA51-52. For example, the complaint describes North Carolina's rules for OBOT, which require monthly counseling during a patient's induction and stabilization period. *See* JA51-52.

The federal standards enumerate "required services," which include providing "adequate medical, counseling, vocational, educational, and other assessment and treatment services." 42 C.F.R. § 8.12(f)(1). Moreover, every patient must undergo an initial assessment and subsequent periodic reassessments "by qualified personnel to determine the most appropriate combination of services and treatment." *Id*. § 8.12(f)(4). "The initial assessment must include preparation of a treatment plan that includes the . . . supportive services that a patient needs," as well as the "frequency with which these services are to be provided." *Id*. Among these, programs are required to provide "adequate substance abuse counseling to each patient as clinically necessary." *Id*. § 8.12(f)(5)(i). Programs must also "provide adequate medical, counseling, vocational, educational, and other assessment and treatment services," and "document that these services are fully and reasonably available to patients." *Id*. § 8.12(f)(1). Programs must also "establish and maintain a recordkeeping system that is adequate to document and monitor patient care." *Id*. § 8.12(g)(1).

Different government programs pay for opioid treatment services in different ways. Medicare pays using a weekly bundled billing system. *See* JA41-43; 42 C.F.R. § 410.67(d). This means that Medicare groups a

suite of services—including providing drugs, dispensing those drugs, providing counseling and therapy, drug screening, and other services— and uses billing codes that encompass whatever services are provided in a given week. JA41-47.

Under this billing procedure, the services provided are not itemized; instead, the codes encompass a range of services provided during a given week. JA45-46. For example, billing code G2067's description is "Medication assisted treatment, methadone; weekly bundle including dispensing and/or administration, substance use counseling, individual and group therapy, and toxicology testing, if performed (provision of the services by a Medicare-enrolled Opioid Treatment Program)." JA45. The total cost of the code is $215.67, including a drug cost of $37.38 and non-drug costs of $178.29. JA45. To bill this code, the program must provide methadone and some other services in a week. *See* JA44.

Providers need not provide every service every week; but they must provide at least one qualifying service. *See* 42 C.F.R. § 410.67(d)(3). This billing procedure recognizes that patients' treatment plans may require varying treatment from week to week (for example, a patient might need medicine every day, but only need therapy twice a month, and drug

9

screening once a month)—and it simplifies the billing procedure by permitting providers to bill using a single code as long as at least one covered service is provided. *See* JA42.

Importantly, however, merely providing one service is no substitute for compliance with the federal opioid treatment standards detailed *supra*, including the requirement to "provide adequate substance abuse counseling to each patient as clinically necessary." 42 C.F.R. § 8.12(f)(5)(i); *see* JA42-43. Indeed, the bundled billing codes explicitly reference the provision of "substance use counseling" as well as "individual and group therapy," JA45—and when the government set the bundled payment rates, it assumed that a typical patient would receive "one substance use counseling session, one individual therapy session, and one group therapy session per week and one toxicology test per month," JA41-42 (quoting 84 Fed. Reg. 62568-01, 62641 (Nov. 15, 2019)). That assumption is one of the inputs into the "Nondrug cost" incorporated into the billing codes (which exceeds the drug cost for all orally administered drugs, JA47). JA44-45. The bundled billing rate amounts thus assume that therapy is regularly provided to patients who need it, and that assumption accounts for part of the money the government pays. *See* JA41-47. Moreover, when

the government created the bundled billing regime, it expressly cautioned that it would "be *monitoring for abuse* given this lower threshold for billing the full weekly bundled payment." JA42 (quotation marks omitted).

Other programs, like Medicaid, TRICARE, and the Veterans Health Administration, pay for opioid treatment services on a fee-for-service basis, meaning that they are billed for, and reimburse for, specific services provided. JA48-57. These programs also require opioid treatment programs providing MAT to comply with federal standards. *See* JA52, JA54, JA57-58. And they impose additional requirements of their own. *See* JA48-57. For example, North Carolina requires providers of office-based opioid treatment to provide "a minimum of once monthly individual or group therapy sessions during the induction and stabilization phases of treatment." JA52. TRICARE explains that opioid treatment programs must adhere to the federal standards and provide "a comprehensive, individually tailored program of medication therapy integrated with psychosocial and medical treatment and support services." JA54.

Pursuant to these requirements, defendants prepared individual treatment plans for every patient they received. *See* JA79. Wheeler

observed and alleges that "[t]herapy and/or counseling are integral parts of every patient's treatment plan." JA79. New patients "are supposed to be seen at least twice a month for counseling with a clinic-contact at least every week," and "established patients are supposed to receive counseling at least once per month." JA81.

Despite establishing treatment plans calling for regular counseling or therapy, "[b]eginning in 2020," defendants' "Asheville facility was documenting that they were doing group therapy, but they were not actually doing group therapy." JA81. Instead, "therapists and counselors were signing group therapy treatment notes that stated that they facilitated 'impromptu lobby group,' 'continuous lobby group,' 'sidewalk group,' and—later—'telehealth group' therapy sessions and 'bibliotherapy.'" JA81. "But these group therapy sessions never happened." JA82. These false notes "often contained significant detail, including a description of dialogue between participants." JA82. Incredibly, "[c]ounselors and/or therapists reused the same fraudulent group therapy notes for different patients"—and sometimes, "different counselors and/or therapists reused the same fraudulent group therapy notes for the same patients on different dates." JA82.

The complaint includes an example note that was re-used, almost verbatim, to describe therapy sessions ostensibly held on September 2, 2020 and also March 3, 2021, March 4, 2021, and March 5, 2021. JA82-84. But "[n]one of the group therapy sessions listed above actually occurred." JA84. This was not an isolated incident. Instead, it appeared that defendants "provided the Asheville facility's counselors and therapists with prewritten, group therapy notes to use for patients," and the "facility's staff then copied and pasted the template group therapy note into individual group therapy notes for patients who picked up medications or had assessments that week." JA84. Thus, "[t]he counselors and therapists at the Asheville facility were systematically duplicating fraudulent group therapy notes to give the illusion that they were providing group therapy." JA84.

The fraud escalated in the spring of 2021, when defendants began claiming to provide "bibliotherapy." JA85. This method of therapy ordinarily involves assigning reading to a patient, and then having the patient discuss the reading with a counselor or therapist. JA85. But defendants held no such discussions. JA86. Instead, patients picking up medication were provided with forms to fill out independently. JA86.

Defendants used those forms to create more fraudulent group therapy notes, giving the impression that therapy had occurred when it had not. JA86. In fact, many of these therapy notes again used generic templates describing fictional therapy sessions. *See, e.g.*, JA86-87. For example, Matthew Lawson, the Asheville facility's clinical manager, e-mailed employees every week with a template group therapy note that had no relationship to any therapy actually provided. JA88-90. Versions of those notes were nevertheless placed in patients' files to suggest that therapy had occurred. JA86. Defendants then billed the government for these fictitious services. JA90.

Alongside the fictitious group therapy sessions, defendants failed to provide appropriate individual therapy and counseling. JA90. Instead of meeting in person, or even by video (as was permitted when in-person visits were risky during the pandemic), defendants "directed their employees in the Asheville facility to perform therapy and/or counseling solely by telephone." JA90. Defendants did this without first determining whether in-person or video options were feasible (a federal requirement). JA38, JA90, JA104. Ordinarily, "no actual therapy and/or counseling occurred"; instead, "counselors and therapists at the Asheville facility often

called patients, had a brief phone call with them, and documented the session as a full individual therapy session." JA91. As a result, "[p]atients at the Asheville facility are not receiving any meaningful therapy from Defendants." JA91. But defendants bill as if they are providing the "entire suite of services." JA91.

Wheeler's complaint provides a representative example of defendants' misconduct, described as "Patient 6" (the name withheld to protect sensitive personal health information), who is a dual Medicare and Medicaid beneficiary. JA94. Wheeler explains that the patient's treatment plan called for methadone as well as counseling, and that an updated treatment program recommended group therapy—but that Patient 6 never actually received any group therapy. JA94. Instead, Patient 6 only received bibliotherapy worksheets. JA94. But, alarmingly, Patient 6's file includes numerous false group therapy notes, many of which are substantively identical to notes in other patients' files. JA95-98. A counselor then met with Patient 6 on July 13, 2021 to update his treatment plan. JA98. The updated plan notes that Patient 6's two previous drug screens were positive, indicating a relapse. JA98. Patient 6 expressed interest in group therapy, and reported success with that therapy in the past; the counselor

indicated that group therapy could be helpful for Patient 6. JA99. But Patient 6 did not receive any group therapy at the Asheville facility. JA99. Nevertheless, defendants billed Medicare and Medicaid for Patient 6's care for multiple weeks in which group therapy was not provided. JA99. Because defendants billed Medicare for methadone opioid treatment, they would have used code G2067 (discussed *supra*), and received $215.67 per week. *Cf.* JA45.

Wheeler alleges that the corporate parent defendants commanded the systematic falsification of therapy notes. JA91. Thus, Wheeler describes an instance where Lawson, the clinical manager of the Asheville facility, sent a false bibliotherapy group note for counselors and therapists to use for the week of July 6, 2021—and then shortly thereafter sent an edited version of the e-mail, explaining that "Corporate wants less detail" in the false notes. JA92. Additionally, the medical director of another one of defendants' facilities, at North Wilkesboro, confirmed to Wheeler that group therapy notes are also falsified at that facility. JA92.

Both Wheeler and North Wilkesboro director reported this misconduct to their respective superiors. JA92. In response, the clinic director of the Asheville facility told Wheeler that the same conduct was occurring

throughout North Carolina, and also stated that defendants' regional director had instructed that Wheeler should "stay in her lane," instead of inquiring into misconduct. JA93. Based on these facts, Wheeler alleges that the misconduct is widespread, occurring throughout North Carolina and the rest of defendants' United States facilities. JA91-93.

This misconduct occurred against the backdrop of other government settlements with the defendants. JA65-78. As relevant here, defendants Acadia and CRC in 2019 entered into a Corporate Integrity Agreement with the government as part of a settlement of a different FCA action. JA67. The CIA imposes substantial compliance and reporting obligations on defendants, including requirements to provide certain training, and to report any material legal violations at defendants' facilities. JA67-75. Wheeler alleges that defendants violated these obligations, too. *See* Argument Part V, *infra*.

Wheeler brought this action in 2021, alleging that defendants' conduct violated the federal and North Carolina False Claims Acts. JA230. After the government declined to intervene, Wheeler filed the operative amended complaint. JA230. The amended complaint alleges multiple theories of FCA liability based on defendants' violations of federal standards

and the CIA. These include causes of action alleging the presentment of false claims (Count 1), the creation and use of false statements or records (Count 2), conversion (Count 3),[4] implied false certification (Count 4), fraudulent inducement (Count 5), and knowingly failing to pay money owed to the government under the CIA (so-called "reverse false claims") (Count 6), as well as corresponding violations of state law (Count 7). *See* JA113-122.

Defendants moved to dismiss on the pleadings. The motion was considered in the first instance by a magistrate judge, who recommended that it be granted. *See* JA262. Over Wheeler's objections, the district court accepted the magistrate judge's report and recommendation and granted the motion to dismiss the amended complaint with prejudice. JA270.[5]

The district court held first that although the complaint pleads false statements and fraudulent conduct at several North Carolina facilities, it does not plead "with sufficient specificity that these practices occurred

---

[4] Wheeler does not appeal the dismissal of the conversion claim, and so omits it from the remainder of this brief.

[5] The following discussion of the district court's holding describes the magistrate judge's report and recommendation, which the district court accepted.

at Defendants' other facilities." JA245. The court thus limited the case only to these North Carolina facilities.

The court held next that the complaint does not plead "with sufficient particularity that Defendants' false representations regarding the provision of group therapy or, more generally, their compliance with applicable laws and regulations, were material to any Government Healthcare Program's payment decisions." JA250.

The court also held that the complaint does not allege the presentment of false claims with sufficient particularity. *See* JA253-254. The court found that the complaint does not plead facts indicating that false claims were necessarily presented to any government healthcare program. JA253-254. In the court's view, Wheeler's allegations about Patient 6 sufficed to show that claims were presented to Medicare—but the court believed that such claims could not be false because the billing code defendants used did not require the provision of group therapy. JA253. With respect to other government programs, the court determined that the complaint did not connect any specific patient's care to claims presented to any specific government program, and therefore failed for lack of particularity. JA253-254.

With respect to "reverse false claims"—*i.e.*, the allegation that defendants kept money they were obligated to pay—the court issued two separate holdings. First, it held that to the extent this "claim is based on falsified group therapy records," it was redundant with the claims for presentment of false claims, and should be dismissed for that reason. JA259. Second, the court held that to the extent the claim was based on violations of the CIA, it was not actionable because stipulated penalties under a CIA do not constitute a definite "obligation" to pay money unless and until the government finds that a violation of the CIA has occurred—and therefore cannot constitute a predicate for a reverse false claims cause of action. JA259-262.

Over Wheeler's objection, the district court adopted the magistrate judge's recommendation and ordered that the complaint be dismissed with prejudice and that judgment be entered for defendants. *See* JA264-270. The court also denied as futile Wheeler's motion to correct a scrivener's error in the amended complaint. JA270. This appeal followed. JA273.

## SUMMARY OF ARGUMENT

The district court's decision should be reversed. Two counts of the complaint—fraudulent inducement (Count 5) and implied false certification (Count 4)—plead that all of defendants' claims are tainted by their knowing failure to abide by federal opioid treatment standards. Two counts (1 and 2) allege that defendants' claims to programs other than Medicare were false, and that defendants made or used false records that were material to those claims. And one count (Count 6) alleges that defendants' knowing violations of their Corporate Integrity Agreement give rise to reverse false claims act liability. We address these causes of action in that order.

**I.** The complaint pleads fraudulent inducement because it pleads that defendants violated federal standards that are expressly identified as conditions of certification and accreditation to provide opioid treatment services to government beneficiaries—and which are material to the government's decision to permit programs to provide such treatment.

Specifically, defendants violated two critical standards: (1) a standard requiring them to provide adequate counseling services as clinically necessary; and (2) a standard requiring them to keep scrupulous records

21

monitoring patients' treatment. Defendants violated these standards because they did not provide adequate group or individual therapy, and because their recordkeeping system was a sham designed to give the false impression that appropriate therapy had been provided.

These violations went to the heart of the bargain between defendants and the government because the provision of adequate counseling and therapy, in addition to drugs, is what separates medication-assisted treatment from mere drug dealing. The omission of the therapy component of the treatment—and the cover-up concealing that omission—were accordingly the sorts of violations that would have prevented the government from permitting defendants to treat beneficiaries in the first instance. Defendants' fraud thus enabled, and therefore tainted, all of their claims for payment to government programs.

The district court said nothing specific about this claim. Instead, it grouped this claim together with others alleging presentment of false claims. The only part of the court's analysis arguably relevant to fraudulent inducement is its discussion of materiality. But the court never explained why compliance with the federal opioid treatment standards—an express condition of certification—was immaterial to certification. Nor

could it, because these regulations form the backbone of the federal governments' requirements in this specific area. Indeed, all indicia—including the government's express designation of the standards as conditions of certification, the substance of the standards, common sense, and the government's actions in response to other violations—indicate that the government takes the federal opioid treatment standards seriously when deciding who can operate an opioid treatment program.

**II.** For similar reasons, defendants are liable for implied false certification. Defendants' claims for payment for opioid treatment represented that defendants provided the bundle of services that opioid treatment programs provide—which includes counseling and therapy as clinically necessary—and also implicitly represented that defendants provided treatment in accordance with the federal opioid treatment standards. But defendants knowingly did not provide all of the required services and kept false records in violation of the federal standards. This made defendants' claims for treatment false, or at least misleading, and therefore fraudulent. This misconduct tainted every claim for payment defendants presented starting in September 2020.

The district court did not address this claim individually, either. It principally appeared to hold that compliance with the opioid standards was not required to present claims to Medicare. That is wrong—at least with respect to the standards defendants violated, which address the very heart of this program, *i.e.*, providing adequate treatment. And that is true not only vis-à-vis Medicare, but for every affected government program, because all of those programs are concerned with providing adequate treatment for opioid use disorder. At a minimum, that conclusion is plausible, which is all the pleading stage demands.

**III.** Counts 1 and 2 address claims for payment to programs other than Medicare, which were made on a fee-for-service basis. Here, defendants presented paradigmatic factually false claims by presenting claims for therapy that never occurred, and substantiated those claims using false therapy notes. It is black-letter law that FCA liability attaches when a defendant presents a claim for payment for services that were not provided. This subset of claims is false for that reason, and the supporting records constitute independent FCA violations.

**IV.** All of the foregoing allegations satisfy Federal Rule of Civil Procedure 9(b), which requires claims for fraud to be stated with

24

particularity. Specifically, Wheeler alleges in substantial detail that defendants engaged in a pattern of misconduct starting in September 2020 that necessarily resulted in the presentment of false claims. She thus identifies what defendants did (stopped providing adequate therapy, but falsified records to make it look like therapy was provided), names individuals at defendants who were responsible for the violations (*e.g.*, Jason Hines and Matthew Lawson), identifies the relevant timeframe (starting in September 2020), describes specific locations (facilities throughout North Carolina), and more. She provides examples of specific government beneficiary patients who received inadequate treatment. She provides specific examples of the false records defendants used to perpetrate and conceal their misconduct. And she bridges the gap to government payment systems by describing, in detail, the ways that the government pays for (and defendants seek payment for) opioid treatment services, specifically. That is more than enough to satisfy Rule 9(b). The district court was wrong to hold otherwise.

**V.** Finally, Wheeler pleads reverse false claims liability based on violations of the CIA. The agreement imposes specific contractual compliance and reporting obligations on defendants CRC and Acadia, which

these defendants failed to meet. In particular, defendants failed to provide Wheeler with the required training, and failed to report and redress the misconduct that she specifically identified to them. These facts, if true, constitute clear violations of the contract, which includes stipulated monetary penalties for any breach. Defendants avoided that obligation by failing to report their noncompliance to the government, which renders them liable under the FCA.

In the district court's view, the fact that the government had to take action to collect the penalties (and could exercise discretion not to collect them), made the obligation too contingent to qualify as a trigger for liability. This holding defies the statutory text, which imposes liability for attempts to avoid any "established duty, whether or not fixed, arising from an express or implied contractual . . . relationship." 31 U.S.C. § 3729(b)(3). Congress adopted this broad statutory definition of an "obligation" in 2009 to make it clear that contingent contractual obligations qualify. And the best judicial authority agrees that a contractual obligation can support liability even when a party must take discretionary action to assert its rights against a counterparty—including in the context of CIAs.

## ARGUMENT

This Court reviews the district court's decision granting a motion to dismiss for failure to state a claim *de novo*, construing "factual allegations in the light most favorable" to the plaintiff. *United States v. Walgreen Co.*, 78 F.4th 87, 92 (4th Cir. 2023).

### I. The Complaint Pleads Fraudulent Inducement by Alleging That Defendants Knowingly Falsified Their Compliance With Federal Opioid Treatment Standards to Obtain Eligibility to Treat Government Beneficiaries for Opioid Use Disorder

Count 5 of the amended complaint alleges that by failing to disclose that they were not going to provide adequate therapy services, defendants misled SAMHSA and its delegated accrediting bodies into certifying and accrediting defendants, thus committing fraudulent inducement (a.k.a. promissory fraud). JA117-119.

Fraudulent inducement arises when an upstream fraud taints downstream claims for payment. The most common situation is when a defendant obtains a government contract or benefit using false statements. Every subsequent claim for payment violates the FCA, even if the claims are accurate. *See, e.g.*, *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787-88 (4th Cir. 1999); *United States v. Molina*

*Healthcare of Ill., Inc.*, 17 F.4th 732, 741 (7th Cir. 2021); *United States v. Strock*, 982 F.3d 51, 60 (2d Cir. 2020); *Marsteller ex rel. United States v. Tilton*, 880 F.3d 1302, 1314 (11th Cir. 2018); *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 902 (9th Cir. 2017); *In re Baycol Prod. Litig.*, 732 F.3d 869, 875-76 (8th Cir. 2013); *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1173-74 (9th Cir. 2006); S. Rep. No. 99-345, at 9 (1986).

Fraudulent inducement is not limited to contracts; it also applies to fraudulent attempts to obtain other government benefits that enable the holder to present claims. For example, in *Campie*, the relator alleged that the defendant used falsified data to deceive the FDA into approving a noncompliant manufacturing facility for a drug. 862 F.3d at 896, 899. The Ninth Circuit held that the complaint stated a claim for promissory fraud based on the defendant's "representations to the FDA and labeling of its products." *Id*. at 904. That is because drug approval was a prerequisite to government payments for the drugs, and so the false statements were "integral to a causal chain leading to payments." *Id*. at 903 (quotation marks omitted).

Here, certification and accreditation as an opioid treatment program was conditioned on programs complying with "Federal opioid treatment standards and approved accreditation elements." 42 C.F.R. § 8.11(f)(7); *see also id.* § 8.12(a) (identifying "compl[iance] with these standards as a condition of certification"). The standards include required services, *e.g.*, providing "adequate substance abuse counseling to each patient as clinically necessary." *Id.* § 8.12(f)(5). Indeed, programs must provide "adequate medical, counseling, vocational, educational, and other assessment and treatment services," which "must be available at the primary facility," and be "fully and reasonably available to patients." *Id.* § 8.12(f)(1). And they must "establish and maintain a recordkeeping system that is adequate to document and monitor patient care." *Id.* § 8.12(g)(1).

As explained *supra*, defendants knowingly violated these conditions. They did not provide adequate substance abuse counseling, but instead relied on worksheets and cursory telephone calls as substitutes for counseling and therapy. JA86, JA91. Their recordkeeping system was also a sham; rather than document and monitor patient care, it principally created the illusion that care was being provided when it was not. JA15-

16. Had defendants been truthful about their operations, they would not have been eligible for certification or accreditation because they would have flunked core program requirements. JA117-119. Accordingly, defendants obtained and maintained their certification and accreditation by fraud, and that fraud tainted each and every claim for payment defendants presented to government healthcare programs.

The district court said essentially nothing about this claim. Although the court acknowledged that Wheeler advanced a claim for fraudulent inducement, it never explained specifically why that claim was inadequate. *See* JA242-243. Instead, the court grouped this theory of liability with others relating to the presentment of false claims. JA243. But the only part of the district court's rationale that even arguably applies to fraudulent inducement is its discussion of materiality, where the court opined that the allegations in the complaint were too general to plead materiality, and likened this case to one in which a defendant issued a boilerplate certification of compliance with all applicable laws. JA249-250.

That comparison is inapt. The district court reached its conclusion by cherry-picking the legal conclusions in Wheeler's complaint—while

ignoring the specific facts Wheeler alleged to support those conclusions. Crediting Wheeler's factual allegations, it becomes clear that this is not a case in which the defendant certified that it complied with every law, but violated some ancillary regulatory requirement. Instead, as the complaint explains, the provision of adequate therapy and counseling is one of the core offerings in any MAT program. *See* JA12, JA33, JA79, JA91. That is because counseling and therapy are the principal mechanisms by which MAT treats underlying addiction and therefore achieves long-term success. JA91. The complaint thus plausibly alleges that if defendants had been honest about their inability or unwillingness to provide therapy, they would not have been certified or accredited, and would not have been reimbursed. JA103, JA112.

Indeed, the allegations here easily identify material violations. The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). In *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016), the Supreme Court explained that materiality focuses on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id*. at 193 (quotation marks

omitted). The Court should find a matter material if a reasonable person would attach importance to it, or if the defendant knew or had reason to know that the government attaches importance to it, even though a reasonable person would not. *See id.*; *see also Walgreen*, 78 F.4th at 93 (finding element met when government decision-makers attached importance to legal requirement, even though validity of the requirement had been challenged). The effect should be measured by considering "the potential effect of the false statement when it is made," as opposed to "the actual effect of the false statement when it is discovered"—often many years later. *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 916-17 (4th Cir. 2003); *see also United States v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008) (similar); *United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29, 37 (D.C. Cir. 2022) (similar). In a claim for fraudulent inducement, courts considering materiality consider the likely effect of the defendant's violations on both the government's initial decision to do business with the defendant as well as subsequent payment decisions. *See Strock*, 982 F.3d at 62. Thus, if a plaintiff shows a likely effect on either decision, the inquiry is satisfied.

To assess the likely effect of the defendant's fraud on the government's decision-making, courts undertake a holistic inquiry: A variety of factors are relevant, and no factor is automatically dispositive. *See Escobar*, 579 U.S. at 191 (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011)). Some relevant factors include whether the government has identified the requirement as a condition of payment, whether the violation goes to the essence of the bargain, and how the government has reacted to similar violations in the past. *Escobar*, 579 U.S. at 194-95 & n.5. This Circuit has also held that when a defendant attempts to cover up noncompliance, that fact is itself probative of materiality because the cover-up indicates the defendant's knowledge that the government regards the requirement as material. *See Walgreen*, 78 F.4th at 94 (citing *United States ex rel. Badr v. Triple Canopy, Inc.*, 775 F.3d 628, 638 (4th Cir. 2015)); *see also United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178-79 (4th Cir. 2017).

Because materiality is holistic, it is typically a jury question. *See, e.g.*, *United States v. Gaudin*, 515 U.S. 506, 512 (1995). After the Supreme Court decided *Escobar*, circuit courts have recognized that a complaint should not be dismissed on materiality grounds when factors point in

different directions. *See, e.g.*, *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 162 (5th Cir. 2019); *United States ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1020 n.5 (9th Cir. 2018); *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 831-37 (6th Cir. 2018); *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 110-12 (1st Cir. 2016). If the plaintiff can identify a factor that weighs in favor of materiality, courts should draw inferences in the plaintiff's favor and deny a motion to dismiss.

The allegations here resemble others that have supported findings of materiality at the pleading stage. For example, in *Escobar*, the Supreme Court considered a complaint alleging that a mental health facility's counselors lacked the necessary training and licensure to provide adequate care to beneficiaries. 579 U.S. at 183-84. The Court held that these requirements were "so central to the provision of mental health counseling that the Medicaid program would not have paid [claims for counseling] had it known of these violations." *Id*. at 196. The violations here are even more grave because defendants failed to provide any meaningful therapy or counseling at all. And unlike the regulations at issue in *Escobar*—which did not expressly identify qualification standards as

conditions of payment or participation in the program—the provision of adequate substance abuse counseling is a required service for opioid treatment programs *and* a condition of certification. *See* 42 C.F.R. § 8.12(a), (f)(5)(i). *Escobar* was clear that the FCA imposes liability for "misrepresenting compliance with a condition of eligibility to even participate in a federal program." 579 U.S. at 192.

The government's response to similar violations likewise demonstrates that defendants' violations were material. *See Escobar*, 579 U.S. at 194. The United States recently intervened in an FCA case against an opioid treatment provider in Rhode Island because the defendant "held itself out as a legitimate [opioid treatment program], and billed the Rhode Island Medicaid Program for comprehensive, Medication-Assisted Treatment" using a bundled billing code effectively "representing that it was providing comprehensive, Medication-Assisted Treatment comprising both drug and non-drug components, when in fact" the defendant "supplied methadone but not required supportive services, including treatment plans and counseling." United States and State of Rhode Island's Resp. to Defendants' Motion to Dismiss, *United States v. Journey to Hope*,

No. 20-cv-451-JJM-LDA, Doc. 28, at 9 (July 27, 2023) (hereinafter "U.S. Response").

The government stressed the central role that therapy plays in these programs, explaining that "Medication-Assisted Treatment encompasses person-centered, comprehensive care with both drug and non-drug services that together distinguish [opioid treatment programs] from mere drug dealers." U.S. Response at 4. In fact, a putative opioid treatment program that dispenses controlled substances (*e.g.*, methadone) without also providing other therapies  faces civil and criminal penalties for distributing drugs under the Controlled Substances Act. *Id*. at 16.

The government further explained that counseling is mandatory because it "promote[s] recovery and operate[s] to prevent patients from simply trading one addiction (illicit narcotics) for another (methadone)." U.S. Response at 5. Indeed, the government was explicit that "had it known of [the defendant's] noncompliance," it "would not have" paid the defendant's claims. *Id*. at 27 n.16. It described the federal opioid treatment standards as "so integral to the government's payment decision as to make any divide between conditions of participation and conditions of payment a 'distinction without a difference.'" *Id*. at 25 (quoting *United*

*States ex rel. Lisitza v. Johnson & Johnson*, 765 F. Supp. 2d 112, 128 (D. Mass. 2011)). The government's clear and strident statements—as well as its decision to pursue FCA remedies against an opioid treatment program for indistinguishable misconduct—are strong evidence that the violations here are material.[6]

Defendants' creation of false therapy notes also weighs in favor of materiality. As in *Walgreen* and *Triple Canopy*, where this Court held that a cover-up was evidence of materiality, the same is true here. One reason to create false group therapy notes is to make it appear to outsiders (*e.g.*, government auditors) that therapy was being provided when it wasn't. JA15-16. This shows that defendants understood that the provision of therapy was material, and that the recordkeeping requirements were, too.

The Seventh Circuit's recent decision in *Molina Healthcare* is also instructive. There, the plaintiff alleged that the defendant contracted with the government to provide a suite of services to government

---

[6] As of today, the motion to which the United States was responding has not yet been decided. The key point for materiality purposes, however, is that the government has manifestly shown that it regards these legal requirements as material.

37

beneficiaries in exchange for capitated payments on a per-beneficiary basis (analogous to Medicare's bundled bills for opioid treatment)—but the defendant knew that it was not providing certain important services at skilled nursing facilities. *See Molina Healthcare*, 17 F.4th at 738. The Seventh Circuit explained that when a defendant contracts to provide a bundle of services, but omits important services from the bundle (the value of which affects the price the government pays for the bundle), a portion of the government's payment is "in essence, payments for nothing." *Id*. The court held that by alleging that the defendant promised to provide services that it had no intention of providing, the complaint stated a claim for fraudulent inducement, *id*. at 741-42, and further held that the provision of those services was an important part of the bargain between the government and the defendant, *id.* at 744. The case is analogous because here, too, defendants falsely promised to provide important services, the availability of which was central to their bargain with the government, and the value of which was incorporated into the amounts the government would pay.

In sum, Wheeler alleges that defendants were ineligible for certification by SAMHSA because they could not meet the mandatory

requirements for certification; they obtained and maintained their certification only by lying, which in turn enabled all of their claims for payment. Each of those claims is false under the theory of fraudulent inducement, and the judgment below should be reversed as to Count 5.

II.  **The Complaint Pleads Implied False Certification by Alleging That Defendants Presented Claims for Opioid Treatment Knowing That They Were Violating Material Requirements Governing Such Treatment**

Count 4 of the complaint pleads that defendants presented false or fraudulent claims to government healthcare programs by implicitly certifying that they complied with the federal standards for opioid treatment programs and related laws when defendants knew that they were not complying.

Liability for implied false certification arises when a defendant presents a claim for payment while omitting its noncompliance with a material legal requirement, such that the claim constitutes a misleading half-truth. In *Escobar*, discussed *supra*, the Supreme Court held that liability could attach when a defendant presented claims for payment for counseling services, while omitting violations of licensing and training requirements for the counselors providing those services. 579 U.S. at 189-90. As the Court explained, the claims for payment were misleading because

anybody reviewing them "would probably—but wrongly—conclude that the clinic had complied" with the relevant legal requirements by using properly licensed and trained counselors. *Id.* at 189. It was not necessary for the requirements to be identified as express conditions of payment; it was enough that the requirements were material. *Id.* at 190-92.

Claims for payment for opioid treatment necessarily imply that services were provided in accordance with the conditions of certification (including the specific federal opioid treatment standards set forth in 42 C.F.R. § 8.12), and as required by patients' individual treatment plans. *See* JA116-117. Thus, these claims necessarily imply that therapy services were available to patients who needed them. That is so whether the claim expressly sought payment for therapy or not. When, as here, the provider billed the government despite failing to provide adequate therapy, the claims are false under the theory of implied false certification. That is true vis-à-vis every affected government program because all of them look to the federal opioid treatment standards as a minimum baseline for opioid treatment programs, and all of them assume that adequate therapy is provided alongside drugs. *See supra* pp.7-11.

The district court held otherwise, reasoning that providers may bill Medicare using bundled billing codes even if group therapy wasn't provided in a particular week, and leaping from that premise to the conclusion that defendants' claims to Medicare using bundled billing codes could not have been false. JA253-254. This reasoning misses the mark because the thing that made defendants' claims false is not that they used the bundled billing code; it is that they presented the claims knowing that they were wildly out of compliance with clear and critically important federal standards for opioid treatment.

This difference matters. In the district court, Wheeler candidly acknowledged that not every patient necessarily must attend therapy every week for providers to bill the government using bundled billing codes. JA42-43, JA202. For example, many patients' treatment plans will only call for therapy sessions once or twice a month—and not weekly. Other patients may be unable to attend scheduled therapy sessions, but the provider might provide other services for which the government should be billed. In those hypotheticals, the provider would have complied with the federal standards by making therapy services available when clinically appropriate, keeping honest and accurate records, and

furnishing sufficient care to support a bundled bill each week. But those situations are a far cry from this case, where providers *never* provided adequate therapy, even to patients that wanted and needed it—and instead falsified records to make it look like therapy was provided. Nothing in the text or history of the bundled billing regulations suggests that providers may do *that*. On the contrary, when the government adopted bundled billing for Medicare, it explained that it would "be *monitoring for abuse*" of the procedure. JA42. And it also explained that the bundled billing rates assumed that patients received regular counseling. JA41-42.

To the extent the district court believed that defendants' claims for payment do not implicitly certify making adequate therapy available to patients, that was error. The provision of therapy is a legal requirement enshrined in the federal standards for opioid treatment. *See* 42 C.F.R. § 8.12(f)(5) (listing counseling services as a "[r]equired service[]" and requiring OTPs to "provide adequate substance abuse counseling to each patient as clinically necessary"). The State, similarly, requires at least monthly counseling for Medicaid patients during the induction and stabilization phases of office-based opioid treatment, JA52, and federal law requires compliance with state law, JA106. Although these rules are not

expressly identified as conditions of payment, the Supreme Court in *Escobar* held that "[d]efendants can be liable for violating requirements even if they were not expressly designated as conditions of payment." 579 U.S. at 181. "What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Id.*

For the reasons explained *supra* pp.29-38, it is at least plausible that all of the federal opioid treatment standards are material to claims for payment for opioid treatment programs. After all, the standards are not voluminous; each one is identified as a condition of certification; and each one is germane to the efficacy of the treatment the government is paying for, and therefore goes to the essence of the bargain between the government and defendants. But the Court need not go so far to rule in Wheeler's favor. It would be enough to hold that Wheeler's complaint plausibly alleges that providing adequate counseling and therapy—which is specifically identified as a required service, JA12 (quoting 42 C.F.R. § 8.12(f)(5)(i)), is name-checked in the relevant billing codes, JA45-46, is required by State law, JA52, and is a key element to the program's

success, JA91—is a material requirement. Indeed, given that the bundled billing codes themselves identify "substance use counseling" and "individual and group therapy" as parts of the "weekly bundle," JA45-46, anybody reviewing such a claim would probably—but wrongly—conclude that therapy had been provided to patients who needed it in a given week. That makes defendants' claims at least as misleading as the claims the Supreme Court deemed false in *Escobar*.

The implied false certification claim here is just as strong or stronger than other claims found to be sufficient at the pleading stage. For example, in *Triple Canopy*, the defendant promised to ensure that its employees were appropriately qualified as a condition of its contract with the government—but instead used unqualified employees, falsified their records, and billed the government for those employees' work. 857 F.3d at 175-76. This Court held that the claims were false under an implied false certification theory because "anyone reviewing Triple Canopy's invoices 'would probably—but wrongly—conclude that [Triple Canopy] had complied with core [contract] requirements." *Id*. at 178 (alterations in original) (quoting *Escobar*, 579 U.S. at 189). The Court held that the violations were also material, relying on "common sense and Triple Canopy's own

actions in covering up the noncompliance." *Id*. The same factors compel the same result here.

Similarly, in *Molina Healthcare* (cited *supra* for its discussion of fraudulent inducement and materiality), the Seventh Circuit also found that the complaint alleged a claim for implied false certification. *See* 17 F.4th at 743. There, the court explained that even though the defendant did not bill the government for specific services, the payments the defendant received were based, in part, on the availability of a complete bundle of services—and so the claims were implicitly false when the defendant knew that it was not providing all of the agreed services. *See id.* So too here: The availability of therapy services was incorporated into the rates the government paid, and the government explained that it expected patients typically to obtain weekly counseling. JA43-47. When defendants billed the government knowing that they were not providing therapy services, they presented implicitly false claims. This was true vis-à-vis every government program. The judgment below should accordingly be reversed as to Count 4.

### III. The Complaint Pleads the Presentment of False Claims and the Use of False Records by Alleging That Defendants Billed the Government for Therapy Services That Were Not Provided as Billed, and Falsified Therapy Notes to Substantiate Those False Claims

Wheeler's complaint also pleads the presentment of false claims (Count 1) and the use of false records material to those claims (Count 2). JA113-115. These causes of action relate to government programs other than Medicare, which defendants billed on a fee-for-service basis. These causes of action allege that defendants billed the government for therapy services that were not provided, and created false group therapy notes to substantiate those bills.

Claims seeking payment for services that were not provided are archetypal factually false claims, and actionable as such. *See, e.g.*, *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 675 (9th Cir. 2018) (describing factually false claims as encompassing claims for goods and services never provided); *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 741 (10th Cir. 2018) (similar); S. Rep. No. 99-345, at 9 ("[A] false claim may take many forms, the most common being a claim for goods or services not provided . . . ."). Thus, a claim expressly seeking payment for group therapy services, when no such services were provided, is

a paradigmatic false claim. Liability attaches to anybody who presents such a claim (*i.e.*, ATS in this case), and to anybody who causes another to present such a claim (*i.e.*, the parent company defendants). *See* 31 U.S.C. § 3729(a)(1)(A). Similarly, Wheeler alleges that defendants failed to provide legally adequate individual therapy by carrying out cursory phone calls in lieu of actual therapy sessions. *See* JA90-91. Those claims are likewise false.

Independently, a defendant violates the FCA when he makes, uses, or causes to be made or used, any false record that is material to a false claim. *See* 31 U.S.C. § 3729(a)(1)(B). This cause of action covers the creation of false therapy notes, which gave the impression that therapy services were provided when they were not. It applies both to ATS and to its corporate parents, which caused ATS to make and use the false notes.

The district court did not doubt that this claim is legally viable. Instead, it concluded that the complaint lacked sufficient particularity to show that claims were presented to government healthcare programs. *See* JA253-254. That issue is addressed in Part IV, *infra*.

## IV. The Foregoing Allegations Satisfy Federal Rule of Civil Procedure 9(b)

The foregoing allegations all satisfy Federal Rule of Civil Procedure 9(b), which provides that "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud," except for "knowledge, and other conditions of a person's mind," which may be alleged generally. "These circumstances are often referred to as the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quotation marks omitted). Although the standard requires significant detail, this Court has repeatedly confirmed that "'[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.'" *United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 195 (4th Cir. 2022) (alteration in original) (quoting *Harrison*, 176 F.3d at 784, 789).

A common Rule 9(b) flashpoint in FCA cases is whether the complaint pleads the presentment of false claims with particularity. This Court has held that it is not enough "merely to describe a private scheme

in detail but then to allege simply and without any stated reason . . . that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 196 (4th Cir. 2018) (quotation marks omitted). "Rather, Rule 9(b) requires that the complaint provide some indicia of reliability to support the allegation that an actual false claim was presented to the government." *Id*. at 197 (quotation marks omitted). This Court has identified two ways to plead presentment with particularity: first, to allege details of specific false claims that were allegedly presented; second, to allege a pattern of conduct that would necessarily have led to the submission of false claims. *Id*.

Under the second method, when a complaint alleges underlying fraudulent conduct with detail, it must also provide "some explanation of the billing structure or how or whether the government paid." *Grant*, 912 F.3d at 198. This rule does not "require[] a relator to produce documentation or invoices at the outset of the suit," and does not bar "employees who do not have specific knowledge of a company's financial and billing structure" from bringing claims. *Id*. at 199. Instead, the rule requires only "that plaintiffs connect the dots, even if unsupported by precise

documentation, between the alleged false claims and government payment." *Id*. For example, the complaint could allege, "upon information and belief," that "bills are routinely sent to the government" after the fraudulent work is performed, "and are routinely paid as presented," which would "fill[] that gap." *Id*. The Court also noted in *Grant* that the need for explanation was "particularly" acute because the defendant was three levels removed from the government in the subcontracting relationship—and so it was unclear how misconduct by the defendant would affect the government's payments. *Id*. at 198. The Court distinguished that case from ones in which "the defendant contracted *directly* with the government, and the complaint provided at least some explanation of the billing structure." *Id*.

Wheeler's complaint contains the allegations that were missing in *Grant*. First, it describes the fraudulent conduct with particularity. Thus, Wheeler describes her role and the vantage point it gave her into defendants' fraud. JA14, JA18-19, JA25, JA79, JA81-82, JA84-85, JA92-93, JA110. She explains, based on multiple sources including her own observation, that group therapy was not provided to anybody starting in September 2020, and that individual counseling from that point was limited

to brief phone calls without any prior attempts to provide in-person or even video-based counseling. JA81-91. She produces multiple examples of false therapy notes that were repeatedly used to falsify patient records, identifying people who were involved in creating and signing the notes, and noting the dates of the fictitious therapy sessions. *E.g.*, JA82-84, JA87, JA95-97. She describes the transition in March 2021 to "bibliotherapy" and the use of fraudulent worksheets to create the impression that therapy had been provided. JA85-86. She includes the particularly detailed example of "Patient 6," a government beneficiary who was testing positive for drugs (indicating relapse), who asked for group therapy as a way to get better—but never received therapy despite it being recommended in his updated treatment plan, and received only falsified therapy notes instead. JA94-100. She describes her own repeated efforts to redress the misconduct, including who she talked to and how they reacted by telling her to "stay in her lane." JA92-93, JA110-111. She shows that this misconduct was occurring throughout North Carolina through her own observations and conversations with two knowledgeable coworkers. JA92-93. She identifies specific evidence that the misconduct was not

51

limited to that State because it was company-wide (*e.g.*, the directive to modify the content of a false therapy note that came from "corporate"). JA92.

Wheeler's complaint also bridges the gap between this systematic misconduct and bills presented to the government. She explains that—unlike the subcontractor defendant in *Grant*—defendants contracted directly with the government and sought reimbursement directly from government healthcare programs. JA53, JA59-64. She includes substantial explanation of the federal and state standards governing opioid treatment, JA38-40, as well as the relevant government programs' payment policies and practices relating to opioid treatment, JA35-37, JA41-58. This includes a description of the Medicare bundled billing system, as well as the opioid reimbursement practices for Medicaid, TRICARE, the VA, and others. She also provides specific examples of patients whose treatment was covered by the government, including Patient 6, a dual Medicare and Medicaid beneficiary—and Wheeler alleges that weekly bills were presented to both Medicare and Medicaid for that patient. JA99-100. And she alleges expressly that defendants' systematic practice

of falsifying group therapy records for government beneficiaries led to the presentment of false claims. JA101-102, JA112.

That is more than enough to satisfy Rule 9(b). Wheeler's allegations meet the standard articulated in *Nicholson* and *Harrison*, which hold that courts should hesitate to dismiss a complaint for lack of particularity when the defendant has notice of the allegations and the complaint demonstrates that the plaintiff has substantial pre-discovery evidence of wrongdoing. *See* 42 F.4th at 195. Here, defendants know exactly what they are accused of doing wrong, and Wheeler has substantial evidence from her own employment, much of it reproduced verbatim in the complaint, of defendants' misconduct. Thus, taking Wheeler's allegations as true, false claims were necessarily presented to the government because any claim defendants presented that expressly or implicitly represented that therapy was available was false under the theories enumerated *supra*—and defendants allegedly presented multiple claims for Patient 6, and many others, too.

Wheeler's allegations also suffice under persuasive authorities. Like this Court in *Nicholson* and *Harrison*, other circuits apply Rule 9(b) to achieve its purposes, which are to provide defendants with notice of

the allegations against them, and to block meritless claims based on nothing more than speculation. *See, e.g.*, *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 51 (1st Cir. 2020). Accordingly, when dismissal would not serve these purposes—for example, because the defendant has notice of the charges against it, and the pleadings suggest that the suit is meritorious—the rule does not compel dismissal. *See, e.g.*, *Polukoff*, 895 F.3d at 745 ("Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim.") (quotation marks omitted); *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 86 (2d Cir. 2017) (explaining that overly rigid application of Rule 9(b) "would discourage the filing of meritorious *qui tam* suits that can expose fraud against the government" and allowing a complaint to go forward when doing so did "no violence to [Rule 9(b)'s] purposes"); *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1183 n.11 (9th Cir. 2016) ("[W]hat matters here is whether the complaint adequately pleads the circumstances of fraud to satisfy the dual purposes of Rule 9(b), not whether the complaint employs a particular means of doing so.").

In particular, this Court cited favorably the Fifth Circuit's decision in *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009). *See United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 457 (4th Cir. 2013) (citing *Grubbs* as an example of a case where "specific allegations of the defendant's fraudulent conduct necessarily led to the plausible inference that false claims were presented to the government"). In *Grubbs*, physicians schemed to seek reimbursement for services that were never performed, and disclosed the existence of the scheme to the plaintiff. 565 F.3d at 184. Although the plaintiff had no information about specific bills presented to the government (or even knowledge whether the bills were ultimately presented or paid), the plaintiff was able to identify patients for whom services were not performed, but false records were created. *Id.* at 192. The Fifth Circuit held that this was "more than probable, nigh likely, circumstantial evidence that the doctors' fraudulent records caused the hospital's billing system in due course to present fraudulent claims to the Government." *Id.* "[T]he court further concluded that it would 'stretch the imagination' for the doctors to continually record services that were not provided, but 'to deviate from the regular billing track at the last moment so that the recorded,

55

but unprovided, services never get billed.'" *Nathan*, 707 F.3d at 457 (quoting *Grubbs*, 565 F.3d at 192). The Fifth Circuit accordingly held that the allegations satisfied Rule 9(b); and this Court agreed with that conclusion in *Nathan*. *See id.* at 457-58.

Wheeler's allegations closely resemble the allegations in *Grubbs*. Here, as in *Grubbs*, the plaintiff alleges, based on personal knowledge and observation, that defendants created false records of services that were never provided, *i.e.*, false therapy notes. Here, as in *Grubbs*, Wheeler has identified a patient (Patient 6) for whom services were not provided, together with specific dates for which defendants claim to have provided care. JA99. And here, as in *Grubbs*, it would stretch the imagination to believe that defendants went through the trouble of creating and revising false therapy notes relating to those dates (as well as the myriad others discussed in the complaint), but did not bill the government for the services ostensibly rendered. Indeed, Wheeler alleges that Acadia receives the majority of its revenue from government healthcare programs—making the inference easy. JA21; *cf. United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 372 (5th Cir. 2017) (applying *Grubbs* to hold that "[a] strong inference that the named hospitals submitted claims to Medicare

. . . could likely be drawn" from the allegation that "[n]early every hospital participates in Medicare and would most likely have billed Medicare had they performed procedures using [the defendant's] stents on a person over age 65"). Under *Grubbs*—which this Court cited approvingly in *Nathan*—Wheeler's allegations adequately plead the presentment of claims.

The district court appeared to acknowledge that Wheeler's allegations relating to Patient 6 sufficiently plead that claims were presented to Medicare. But the court held that these claims were not false because the provision of group therapy is not a necessary condition to using the bundled billing codes. JA253-254. For the reasons explained *supra* pp.40-44, that reasoning is incorrect, and the complaint pleads the presentment of false claims to Medicare. That alone warrants reversal.

The district court independently erred in deciding that Wheeler's allegations were insufficient to plead the presentment of claims to other government healthcare programs. In this regard, the court held that even if the allegations pleaded with particularity that claims were presented to Medicare, no allegations linked the treatment of specific patients to claims to other programs. *See* JA253-254. That was error. This Court's precedents do not hold that Rule 9(b) requires plaintiffs alleging

healthcare fraud to identify each and every alleged false claim (or every relevant patient) with particularity; indeed, no circuit requires that. Instead, the law requires plaintiffs to provide "some indicia of reliability" that false claims were presented. *Grant*, 912 F.3d at 197 (quotation marks omitted). Once the plaintiff meets that test, Rule 9(b) does not require even more particulars before discovery begins. Instead, the scope of defendants' fraud is a matter properly determined on a full factual record after discovery has concluded.

Here, Wheeler has alleged enough to at least probe the degree to which defendants presented claims for group therapy to the government from September 2020 onward. By alleging that defendants engaged in a systematic practice of not providing therapy, falsifying the related therapy notes, and billing the government—and by providing specific examples (including Patient 6) showing that defendants billed government healthcare programs for the care of beneficiaries who were affected by the scheme, Wheeler has carried her burden to plead presentment. Nothing in the text or the logic of Rule 9(b) requires Wheeler also to supply specific examples of beneficiaries of each and every affected government

program when defendants' scheme affects all of them in essentially the same way.

The same is true of the district court's holding that although the complaint adequately pleads misconduct in defendants' North Carolina locations, it does not plead misconduct elsewhere. JA245-246. On the contrary, as explained *supra*, Wheeler's evidence supports the allegation that the directive to use false therapy notes (and even the content of those notes) did not originate with ATS in North Carolina, but instead came from "corporate," indicating a likely nationwide practice. *See, e.g.*, JA92. That allegation is bolstered by the government's previous settlements with defendants raising fraud issues in other jurisdictions. *See* JA64-67.

A contrary rule would radically curtail the effectiveness of the FCA against widespread frauds. By artificially limiting the scope of Wheeler's action only to Medicare claims in North Carolina, the district court effectively insulated parts of the same fraudulent scheme from any meaningful scrutiny. But courts across the nation have cautioned that Rule 9(b) "is context specific and flexible and must remain so to achieve the remedial purpose of the False Claim [*sic*] Act." *Grubbs*, 565 F.3d at 190; *United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015) ("Rule

9(b) does not inflexibly dictate adherence to a preordained checklist of 'must have' allegations."); *United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 918 (8th Cir. 2014) ("Rule 9(b) is context specific and flexible[.]" (quotation marks omitted)). When, as here, a plaintiff alleges a corporate-directed nationwide scheme to bill for therapy services that were never provided, together with reliable indicia showing that claims were presented according to that scheme, the right result is for the entire action challenging that scheme to proceed to discovery.

Finally, although the district court said nothing about it, Wheeler's complaint pleads fraudulent inducement with particularity. She alleges exactly which services defendants were not providing, including by identifying the relevant timeframe, and explains exactly why that failure was material to the defendants' certification and accreditation. Because a party seeking certification and accreditation *must* certify its compliance with the federal opioid treatment standards to obtain those benefits, and because certification and accreditation are necessary prerequisites to making any claim for reimbursement to government programs, it is a fair inference that defendants falsely certified their compliance with the

federal opioid treatment standards to obtain and maintain their certification and accreditation.

Indeed, that is what the Seventh Circuit held in *Molina Healthcare*. There, the plaintiff alleged that the defendant renewed its contract with the government by fraud because it never disclosed that it was not providing important services. *See* 17 F.4th at 741. The district court held that the claim failed for lack of particularity "because it did not include any details about the contract-renewal negotiations between [the defendant] and the [government.]" *Id*. But the Seventh Circuit reversed. As the court explained, "Rule 9(b) requires specificity, but it does not insist that a plaintiff literally prove his case in the complaint." *Id*. As long as the plaintiff provides "details indicating when, where, how, and to whom the allegedly false representations were made," which "plausibly supports the inference" that fraud occurred, it is not necessary also to provide "information that exists only in [the defendant's] files." *Id*. Thus, it would be unreasonable to force a plaintiff to plead the details of "documents or conversations" that he could not have observed (the details of which were already in the defendant's possession); instead, it was enough for the plaintiff to "set forth precise allegations about the beneficiaries, the time

period, the mechanism for the fraud, and the financial consequences." *Id*. The court acknowledged that "at trial or upon a motion for summary judgment," the plaintiff "will face a different burden." *Id*. But it held that "for now," the plaintiff's allegations were "enough." *Id*. The same is true here: Wheeler alleges which certification requirements defendants violated and how they violated them, making any promise to abide by those requirements "fraudulent on its face," and therefore actionable. *Id*. at 742. At the pleading stage, that is enough to satisfy Rule 9(b).

**V.     The Complaint Pleads Reverse False Claims by Alleging That Defendants Knowingly Concealed and Avoided Their Obligations to Pay Money Due Under Their Corporate Integrity Agreement**

Count 6 alleges violations of the FCA's reverse false claims provision, which applies to anybody who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The statute defines an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Id*. § 3729(b)(3). And the word "knowingly" refers to actual knowledge, deliberate

ignorance, and reckless disregard. *Id*. § 3729(b)(1). Here, the violation is based on defendants' Corporate Integrity Agreement, which carries stipulated penalties: When defendants knowingly violated the CIA, the obligation to pay penalties came into play—but defendants concealed and avoided their obligation to pay those penalties by knowingly failing to report their violations.

In more detail, the CIA is an agreement between the Office of Inspector General of the Department of Health and Human Services (OIG) and defendants Acadia and CRC. JA67, JA124. Defendants entered the CIA as a condition of a 2019 settlement with the government after defendants billed Medicaid $8.5 million for lab tests that had not been performed by Acadia's treatment centers. JA66-67. The CIA imposes compliance, training, and reporting obligations on Acadia, CRC, and their agents, including ATS. *See* JA70. Among these, the CIA requires Acadia and CRC to notify the government of any "Reportable Event," defined (in relevant part) to include any substantial overpayment by the government, or any matter that a reasonable person would consider a probable violation of any law applicable to any federal healthcare program for which penalties or exclusion may be authorized. JA73, JA135-137. Any

breach triggers stipulated monetary penalties. JA74-75, JA145-148. And any material breach constitutes a basis for Acadia or CRC's exclusion from participation in federal healthcare programs. JA75, JA148-149.

Wheeler alleges that defendants violated the CIA in multiple ways. First, they failed to comply with the training requirements by failing to provide Wheeler herself with the required training and notifications. JA110. Second, after Wheeler repeatedly notified defendants of ongoing violations relating to the falsification of group therapy records, defendants took no action—even though each of these notifications was a reportable event. JA110-111. Nevertheless, defendants certified their compliance efforts to the government, as required by the CIA. JA111. Defendants thus knowingly concealed their violations of the CIA to avoid stipulated monetary penalties, and made false records that were material to those obligations—all in violation of the reverse false claims provision. JA119-120.

The district court rejected this claim, holding that because the CIA provides that stipulated penalties only attach if OIG decides to impose them, the stipulated penalties are too contingent to constitute "obligations" under the FCA. JA260-262. In the district court's view, an

64

obligation cannot be contingent on the government's enforcement discretion. No federal circuit has yet decided this question, and the lower courts that have considered it are split.

This Court should reverse. The FCA expressly defines the word "obligation" to include "an established duty, *whether or not fixed*, arising from an express or implied contractual . . . relationship." 31 U.S.C. § 3729(b)(3) (emphasis added). When Congress enacted this broad definition, it explained that the definition "expressly includes contingent, non-fixed obligations," to ensure that the statute captures "the spectrum of possibilities" that could constitute an obligation. S. Rep. No. 111-10, at 14 (2009); *see also id.* (explaining that the new definition "includes fixed *and contingent* duties owed to the Government" (emphasis added)).

Obligations to pay stipulated penalties under the CIA fall within the plain text and intended meaning of this definition. The CIA is plainly a contract that creates a relationship between defendants and the government—and it imposes clear duties on defendants, with specified monetary penalties in the event of a violation. *See* JA145-147. Although the penalties will only be collected if OIG seeks them, there is no doubt that, if the facts pleaded in Wheeler's complaint are true, defendants violated

the CIA such that the penalties are in fact owed. Under these circumstances—where a violation has occurred, and the only question is whether the government will enforce the contract—the obligation to pay the penalties is sufficiently concrete to constitute an "established duty," even if it has not yet been "fixed" by the government's decision to enforce the CIA. 31 U.S.C. § 3729(a)(1)(G). At least, that is true at the pleading stage, where the Court must take Wheeler's allegations as true—and therefore conclude that the penalties are owed.

That is the reading of the statute adopted in *United States ex rel. Boise v. Cephalon, Inc.*, 2015 WL 4461793 (E.D. Pa. July 21, 2015), and *Ruscher v. Omnicare Inc.*, 2014 WL 4388726 (S.D. Tex. Sept. 5, 2014). These courts explain that the obligation to pay penalties under a CIA arises at the moment of a violation—and not when a later demand for payment is made. In support, they explain that every contractual obligation to pay money in the event of a breach could be described as contingent on the counterparty's decision to exercise its rights to sue and collect the money. If that were enough to defeat a reverse false claims action, it would be essentially impossible to bring such an action based on a contract at all.

Wheeler's reading also finds support in the reasoning in *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189 (10th Cir. 2006), a case Congress cited approvingly in the legislative history for the broadened definition of "obligation." *See* S. Rep. No. 111-10, at 14 n.14. There, the defendant argued that when the imposition of fees required discretionary action by the government, that discretionary step "render[ed] the obligation contingent and thus outside the scope of" the pre-amendment statute. *Bahrani*, 465 F.3d at 1203. Both the plaintiff and the United States argued that this was incorrect, and the Tenth Circuit agreed, holding that the defendant's obligation arose once the government was entitled to charge the relevant fees, and "the need for some further governmental action or some further process to liquidate an obligation does not preclude a reverse false claims action." *Id*. at 1204. The same is true here: The obligation to pay the CIA's stipulated penalties arose as soon as defendants breached the CIA—and it does not matter that OIG would have to decide to collect the penalties.

For the foregoing reasons, the district court erred in holding that the complaint fails to state a cause of action for reverse false claims based on violations of the CIA. These violations are stated with particularity

because Wheeler identifies specific reportable events defendants failed to report, as well as specific certifications that she alleges were false. The reverse false claims action should proceed.

## CONCLUSION

The district court's judgment should be reversed.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument. But if the Court prefers to reverse without oral argument, that would also be fine by us.

Respectfully submitted,

s/Tejinder Singh

Gary W. Jackson
Kaitlyn E. Fudge
LAW OFFICES OF JAMES SCOTT FARRIN
555 S. Mangum St., Suite 800
Durham, NC 27701
Tel. (919) 688-4991

Willian N. Nettles
Frances C. Trapp
John L. Warren III
LAW OFFICE OF BILL NETTLES
2008 Lincoln St.
Columbia, SC 29201
Tel. (803) 814-2826

Tejinder Singh
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel. (202) 629-3530
tejinder.singh@sparacinopllc.com

*Attorneys for Plaintiffs - Appellants*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) because it was prepared in a proportionally spaced typeface using Microsoft Word New Century Schoolbook 14-point font.

I also certify that the brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,947 words, exclusive of the cover page, table of contents, table of authorities, statement regarding oral argument, certificate of counsel, signature block, and certificate of service.

<u>s/Tejinder Singh</u>
Attorney for Appellant

January 12, 2024

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system on January 12, 2024. I certify that, with one exception, participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

The one participant who is not a registered CM/ECF user has consented to service by e-mail. I certify that I served this brief by e-mail on Madeline Lea (mlea@ncdoj.gov), and a copy to her colleague Special Deputy Attorney General Steven McCallister (SMcCallister@ncdoj.gov).

<u>s/Tejinder Singh</u>
Attorney for Appellant

January 12, 2024