No. 23-2101

# United States Court of Appeals
# for the Fourth Circuit

UNITED STATES EX REL. LISA WHEELER;
STATE OF NORTH CAROLINA EX REL. LISA WHEELER

Plaintiffs – Appellants,

v.

ACADIA HEALTHCARE COMPANY, INC.; CRC HEALTH, LLC;
ATS OF NORTH CAROLINA, LLC, d/b/a Mountain Health Solutions
Asheville, d/b/a Asheville Comprehensive Treatment Center, d/b/a
Mountain Health Solutions North Wilkesboro, d/b/a North Wilkesboro
Comprehensive Treatment Center

Defendants – Appellees.

Appeal from the United States District Court
for the Western District of North Carolina

## APPELLANT'S REPLY BRIEF

Gary W. Jackson
Kaitlyn E. Fudge
LAW OFFICES OF JAMES SCOTT FARRIN
555 S. Mangum St., Suite 800
Durham, NC 27701
Tel. (919) 688-4991

Willian N. Nettles
Frances C. Trapp
John L. Warren III
LAW OFFICE OF BILL NETTLES
2008 Lincoln St.
Columbia, SC 29201
Tel. (803) 814-2826

Tejinder Singh
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel. (202) 629-3530
tejinder.singh@sparacinopllc.com

*Attorneys for Plaintiffs - Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION ............................................................................................1

ARGUMENT ....................................................................................................4

   I.  Wheeler Did Not Waive Her Fraudulent Inducement and Implied False Certification Claims. ...............................................4

   II. The Complaint Pleads Fraudulent Inducement. ...........................9

   III.The Complaint Pleads Implied False Certification. .....................20

   IV. The Complaint Pleads the Presentment of False Claims and Use of False Records With Particularity. ......................................22

   V.  The Complaint Pleads Reverse False Claims. ..............................31

CONCLUSION ...............................................................................................35

# TABLE OF AUTHORITIES

## Cases

*Elijah v. Dunbar*,
66 F.4th 454 (4th Cir. 2023).................................................................5

*Martin v. Duffy*,
858 F.3d 239 (4th Cir. 2017) ..............................................................5

*Osmon v. United States*,
66 F.4th 144 (4th Cir. 2023)........................................................ 4, 5, 8

*United States ex rel. Bahrani v. Conagra, Inc.*,
465 F.3d 1189 (10th Cir. 2006) .......................................................32

*United States ex rel. Grant v. United Airlines Inc.*,
912 F.3d 190 (4th Cir. 2018) ....................................................... *passim*

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) ....................................................... 27, 28

*United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*,
707 F.3d 451 (4th Cir. 2013) ................................................... 25, 26, 28

*United States ex rel. Nicholson v. MedCom Carolinas, Inc.*,
42 F.4th 185 (4th Cir. 2022)........................................................ 26, 27

*United States ex rel. Quaresma v. Journey to Hope, Health
& Healing, Inc.*,
--- F. Supp. 3d ----, 2024 WL 1340920 (D.R.I. Mar. 29, 2024) ......... 17, 18

*United States ex rel. Schneider v. JPMorgan Chase Bank, N.A.*,
878 F.3d 309 (D.C. Cir. 2017)........................................................33

*United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*,
843 F.3d 1033 (5th Cir. 2016) ........................................................34

*United States v. Molina Healthcare of Ill., Inc.*,
17 F.4th 732 (7th Cir. 2021).................................................... 14, 15, 16

*Weaver v. United States Postal Serv.*,
No. 21-1157, 2024 WL 94298 (4th Cir. Jan. 29, 2024)..........................4

## Statutes

28 U.S.C. § 636(b)(1) ...............................................................4

31 U.S.C. § 3729(b)(3) ....................................................... 32, 33

## Regulations

42 C.F.R. § 8.11(a)(3) ..........................................................15

42 C.F.R. § 8.12 ....................................................................9

42 C.F.R. § 8.12(f)(1) ..................................................... 1, 3, 10

42 C.F.R. § 8.12(f)(5)(i) ................................................ 1, 3, 10

42 C.F.R. § 8.12(g)(1)......................................................... 1, 10

42 C.F.R. § 410.67(b)(3) (2021) ............................................12

42 C.F.R. § 410.67(b)(4) (2021) ............................................12

## Rules

Fed. R. Civ. P. 9(b) ........................................................*passim*

## Other Authorities

S. Rep. No. 111-10 (2009)....................................................32

**INTRODUCTION**

Wheeler alleges that defendants' Opioid Treatment Programs (OTP) flagrantly violated federal treatment standards from September 2020 onward. Specifically, defendants' programs provided powerful narcotics to patients—but stopped offering *any* group therapy sessions, and replaced individual therapy with cursory phone calls that were inadequate to address patient needs. This violated core requirements to provide "adequate substance abuse counseling to each patient as clinically necessary," 42 C.F.R. § 8.12(f)(5)(i), and to "provide adequate medical, counseling, vocational, educational, and other . . . services" and to "document that these services are fully and reasonably available to patients," *id*. § 8.12(f)(1). Defendants compounded these violations by preparing false records stating that group therapy had been provided, when defendants knew otherwise. In addition to violating basic norms against lying, this subverted the requirement to "establish and maintain a recordkeeping system that is adequate to document and monitor patient care." *Id*. § 8.12(g)(1). Defendants did this despite a Corporate Integrity Agreement (CIA) imposing heightened compliance and reporting obligations on them.

The opening brief (OB) explained that this misconduct supports liability under multiple provisions of the False Claims Act (FCA), detailing theories of fraudulent inducement, implied false certification, presentment of false claims and use of false records, and reverse false claims from improperly avoiding penalties under the CIA.

Defendants would rather not discuss these allegations. Accordingly, they contend that Wheeler waived her fraudulent inducement and false certification claims by not lodging hyper-specific objections to the magistrate judge's recommendation. But Wheeler expressly "object[ed] to the Magistrate Judge's recommendation that [these claims] be dismissed." SA7. She described the claims and noted that neither defendants nor the magistrate judge addressed them. SA7 n.6, SA9 n.8, SA11-12. She made legal arguments applicable to the claims, SA8-17, and directed the district court to the prior briefing and hearing about them, SA7. That easily preserves Wheeler's claims under this Court's precedents.

On the merits, defendants mostly argue that they weren't required to provide group therapy to every patient, and suggest that the complaint concedes that they provided *some* individual therapy, so none of their claims were false or fraudulent. This is not a fair reading of Wheeler's

allegations, which are crystal-clear that patients were "not receiving *any meaningful therapy* from Defendants." JA91 (emphasis added). In the language of the regulations, defendants did not provide "adequate" services "to each patient as clinically necessary," nor make adequate services "fully and reasonably available to patients." 42 C.F.R. § 8.12(f)(1), (5)(i).

Defendants also ignore the complaint's most striking allegations of fraud, *i.e.*, that defendants falsified therapy notes to deceive the government. These allegations are game-changers because it is one thing to say, "We aren't required to provide group therapy to every patient." It is quite another to say, "We are allowed to falsely say that we provided group therapy when we didn't." The latter is flatly wrong—and it reveals that defendants' actions were not innocent, but fraudulent. These allegations are also highly probative of materiality because, if true, they would likely influence the government's response. Indeed, what government in its right mind would permit a company that systematically falsifies therapy records to dispense powerful narcotics to vulnerable patients on the taxpayers' dime? The answer—at least plausibly, drawing reasonable inferences in Wheeler's favor—is "no government would do that." For these reasons and many more, the decision below should be reversed.

## ARGUMENT

### I. Wheeler Did Not Waive Her Fraudulent Inducement and Implied False Certification Claims.

The Federal Magistrates Act requires district courts to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). "[A] party wishing to avail itself of its right to de novo review must be 'sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute.'" *Osmon v. United States*, 66 F.4th 144, 146 (4th Cir. 2023) (citation omitted).

This is a "modest bar." *Id.*; *see also Weaver v. United States Postal Serv.*, No. 21-1157, 2024 WL 94298, at *2 (4th Cir. Jan. 29, 2024) ("the bar for de novo review is low"). In *Osmon* itself, the Court was satisfied by a two-and-a-half-page memorandum summarizing the parties' positions, citing cases from other circuits, and objecting to the magistrate's judge's ultimate legal determination. 66 F.4th at 146. The Court explained that "the statute requires an 'objection' rather than a freestanding brief or memorandum of law, and a party need not frame its arguments anew when it objects." *Id.* It accordingly rejected a rule requiring appellants to make "'specific objections' to the magistrate judge's reasoning," or new

arguments about why the magistrate judge was wrong. *Id*. Indeed, the Court has held that an objection merely restating the plaintiff's claims sufficiently alerts the district court to an objection to the dismissal of those claims. *See Elijah v. Dunbar*, 66 F.4th 454, 460 (4th Cir. 2023); *Martin v. Duffy*, 858 F.3d 239, 245-46 (4th Cir. 2017).

Here, Wheeler's objections identify the claims defendants argue were waived, including "Express and Implied False Certifications" and "Fraudulent Inducement," and explain that, "[a]s detailed in [Wheeler's] Response to Defendants' Motion and during the hearing, the Amended Complaint satisfies the standards of plausibility and particularity" with respect to these claims. SA6-7. They specifically "object[] to the Magistrate Judge's recommendation that Counts . . . IV and V be dismissed." SA7. They further explain that defendants' motion "did not address" these claims. SA7 n.6 (pointing the district court to the specific page of Wheeler's response to the motion to dismiss where Wheeler noted defendants' failure to address these claims). Two pages later, the objections discuss the "fraudulent inducement claim," explaining that defendants violated the FCA by devising "a scheme to falsify group therapy records and fail[ed] to provide individual therapy to induce SAMHSA, CARF, and

Government Programs to certify, accredit, and contract with Defendants"—and noting that "[n]either Defendants nor the Magistrate Judge have addressed this claim." SA9 n.8. And two pages after that, the objections discuss the "false certification claims," which are "premised on Defendants' false certifications to Government programs that they were complying with, *inter alia*, federal OTP regulations and the CIA." SA11. The objections elaborate that these "are not 'garden-variety' regulatory requirements," but instead "central and essential preconditions of operation for OTPs," such that their violation was "precisely the type of conduct that the Fourth Circuit has found to be material." SA11-12. After discussing other legal issues, including materiality and particularity (relevant to these claims), the objections conclude by asking the district court to "reject the Report and deny Defendants' Motion to Dismiss." SA21.

The objections also drew the district court's attention to the briefing and to the hearing transcript, SA6-7, where these claims were discussed. *See* JA199-204, JA213-214 (discussing implied false certification and fraudulent inducement and explaining how they reached more broadly than the other claims). At that hearing, Wheeler's counsel explained that these were "separate theories" with their own legal arguments. JA214.

Defendants acknowledge almost all of the above. RB8-9. They also never identify any statement suggesting that Wheeler intended to forsake review of the dismissal of any claim. The district court also reviewed all the claims de novo. That suffices to preserve the claims under this Court's precedents.

Defendants nevertheless argue that the objections were insufficiently specific because they did not lay out the arguments in Wheeler's appellate brief. RB9. That is not what the controlling precedents cited *supra* require. Instead, they require only that the objections inform the district court that Wheeler was objecting to the dismissal of these specific claims—which they did by identifying and describing the claims and objecting to their dismissal, including critiquing the ways the magistrate judge either addressed or did not address them. Defendants cite no authority requiring more.

Defendants argue next that because some of Wheeler's descriptions appeared in footnotes, they don't count. RB11-12. But none of the cases defendants cite involve objections to a magistrate judge's recommendation. Instead, most are about footnotes in briefs. This distinction matters because, as this Court has explained, the Magistrates Act requires only

an "objection," and not a "brief or memorandum of law." *Osmon*, 66 F.4th at 146. Thus, rules that ordinarily might apply to briefs do not apply where the point of a filing is not to make new arguments, but merely to remind the district court to consider arguments already made. In any event, even if the Court ignores the footnotes, the objections—especially in light of their references to the prior briefing and the hearing—put the district court on notice of Wheeler's objections to the dismissal of these specific claims.

Finally, we can't move on without noting that defendants have far worse waiver problems—and their complaints are consequences of their own forfeitures below. The main reason fraudulent inducement and false certification were not discussed in more detail in the magistrate judge's report and the objections is that *defendants said nothing about those claims in their motion to dismiss*. *See* SA7 n.6. Apparently, defendants believe that Wheeler was required to respond to their forfeiture by making all of the arguments she now makes on appeal—but there was no cause to do so. Instead, Wheeler's objections "follow[ed] the structure and headings used in the Report," SA2 n.2, and clearly noted defendants' forfeiture, SA7 n.6, as well as the magistrate judge's errors of law.

8

Additionally, defendants' cases disparaging arguments made in footnotes of appellate briefs pose a problem for defendants, who make many important arguments *only* in footnotes. We'll point these out, and the Court can ignore them or not in its discretion.

## II.    The Complaint Pleads Fraudulent Inducement.

Aside from waiver, defendants say little about Wheeler's claim that they committed fraudulent inducement by renewing their certification and accreditation to operate an OTP while concealing their violations of the core program standards enumerated in 42 C.F.R. § 8.12. In contrast with the opening brief, which put this claim first, OB27-39, defendants tuck it toward the end of their brief, together with implied false certification, RB22-24, 28-30. Their cursory arguments fail under scrutiny.

Defendants argue first that the provision of group therapy is not a condition of certification, and so it does not matter that they did not provide it. *See* RB23. This is a straw man: Wheeler never alleged or argued that providing group therapy was itself a condition of certification. Instead, she alleges that defendants provided *neither* group therapy *nor* adequate individual therapy—and therefore did not provide adequate counseling services in violation of two conditions of certification. *See* 42 C.F.R.

§ 8.12(f)(1), (5)(i); OB29-30. She also alleges that defendants' recordkeeping system—which systematically produced false group therapy notes—violated the separate condition to "establish and maintain a recordkeeping system that is adequate to document and monitor patient care." 42 C.F.R. § 8.12(g)(1); OB29-30. The government would not have certified, accredited, contracted with, or authorized defendants to provide opioid treatment services to government beneficiaries if it knew of defendants' violations. JA118. That is hornbook fraudulent inducement.

Defendants argue that these allegations lack support because Wheeler does not identify specific patients who needed counseling but did not receive it. RB23. Here, defendants ignore myriad specific examples showing that defendants created false records stating that patients received therapy when they had not. *E.g.*, JA81-90, JA94-98. Each of those patients needed therapy; none received it.

As explained in the introduction, these false record allegations show that defendants engaged in willful fraud that goes to the core of their ability to act as responsible opioid treatment providers. For purposes of the fraudulent inducement inquiry, this Court should ask: "Is it at least plausible that if the government had known that defendants were

10

systematically falsifying therapy notes to document sessions that never happened, it would have refused to certify or accredit defendants?" The answer is an obvious "yes."

Defendants' demand for examples is also misplaced because no authority requires them, and Wheeler's allegations are specific. In addition to the examples provided in the therapy notes, Wheeler alleges that "[t]herapy and/or counseling are integral parts of every patient's treatment plan," JA79, that "new patients are supposed to be seen at least twice a month for counseling," JA81, and "established patients are supposed to receive counseling at least once per month," JA81. Despite these requirements, "[b]eginning in September 2020," defendants ceased providing group therapy while nevertheless creating detailed false group therapy notes. JA81-85. In March 2021, defendants started "bibliotherapy," using worksheets in lieu of actual counseling—again falsely documenting that therapy sessions had occurred. JA85-90. These allegations show that defendants did not merely fail to provide therapy—but that they knew they were required to provide therapy and chose not to (hence the false notes).

Defendants also did not "perform the required amount of individual therapy and counseling sessions required under patients' treatment plans and federal and state law." JA90. Specifically, defendants ceased providing in-person individual therapy and counseling, replacing it with phone calls. JA90-91.

Although phone appointments were permissible under certain circumstances, defendants' appointments were deficient for two independent reasons. First, the law permits audio-only calls only when "audio/video communication technology is not available to the beneficiary." JA38, JA43 (quoting 42 C.F.R. § 410.67(b)(3), (4) (2021)). But defendants "made no attempt to ascertain whether patients had the ability to attend therapy and/or counseling sessions in person or by video." JA90. Thus, defendants conducted "therapy and/or counseling solely by telephone," while failing to meet the essential prerequisite to doing so. JA90. Second, the calls themselves were deficient: Counselors and therapists "had a brief phone call with [patients]," where "[f]requently, no actual therapy and/or counseling occurred," and yet defendants "documented the session as a full individual therapy session." JA91. In other words, the calls were shams, disguising that no real therapy was occurring.

Defendants relegate Wheeler's allegations about individual therapy to a footnote arguing that "the crux of the Amended Complaint is alleged false group therapy records." RB15 n.6.[*] Yes, the complaint devotes more real estate to the false therapy notes—but it clearly *also* alleges failure to provide adequate individual therapy. Indeed, a subject heading alleges that defendants failed "to Provide Legally Adequate Individual Therapy." JA90. The Court cannot discount these allegations even if others form the "crux" of the case.

Defendants' footnote also argues that individual therapy requirements changed during the pandemic, and contends that the complaint "openly acknowledges" that appropriate "therapy was provided by Acadia." RB15 n.6. Wrong. As just explained, defendants' phone calls grossly deviated from then-applicable rules.

Defendants thus "provide[d] inadequate individual therapy, no group therapy, and bill[ed] Government Healthcare Programs as if an entire suite of services are provided to [their] patients." JA91; *see also* JA14 (alleging that "since the beginning of the COVID-19 pandemic,

---

[*] It is remarkable that defendants identify the false record allegations as the "crux" of Wheeler's complaint while saying essentially nothing else about the records elsewhere in their brief.

Defendants have failed to perform adequate individual therapy and counseling . . . which leaves patients with no meaningful psychotherapy to support their recovery from addiction"). This, as well as defendants' fraudulent recordkeeping system, violated multiple conditions of certification and accreditation. JA103-109.

Defendants cite no authority for the proposition that factual allegations like these cannot support a fraudulent inducement claim. They also have no answer to Wheeler's leading case, *United States v. Molina Healthcare of Illinois, Inc.*, 17 F.4th 732 (7th Cir. 2021), which upheld a fraudulent inducement claim even though the complaint never identified specific patients who did not receive services. *See* OB37-38, 61-62 (explicating the case).

*Molina* also answers defendants' argument that the complaint does not include sufficient details regarding representations made to SAMHSA. RB24. In *Molina*, the complaint "did not include any details about the contract-renewal negotiations between [the defendant] and the [government,]" but nevertheless survived because it described "beneficiaries, the time period, the mechanism for the fraud, and the financial consequences." 17 F.4th at 741.

Here, as in *Molina*, the complaint alleges fraud in sufficient detail: It explains that, starting no later than September 2020, defendants systematically violated specific conditions of certification and accreditation, JA81, which they were required every three years to renew, JA60; 42 C.F.R. § 8.11(a)(3), resulting in a fraudulent renewal of their OTP certifications and accreditations that allowed them to continue billing the government for Medication Assisted Therapy for opioid use disorder, JA106-109, JA117-119. Defendants could not have been certified or recertified had they honestly described their services, which makes the allegation that they lied to SAMHSA plausible, satisfying Wheeler's burden at the pleading stage.

Here, as in *Molina*, the details of defendants' interactions with SAMHSA "exist[] only in [defendants'] files," 17 F.4th at 741, and therefore need not be pled—both because providing that information would not tell defendants anything they do not already know, and because requiring such allegations at the pleading stage would produce a windfall for secretive fraudsters. *See* OB53-54 (citing additional Rule 9(b) precedents, which defendants ignore). Wheeler acknowledges, of course, that "at trial or upon a motion for summary judgment [she] will

15

face a different burden." *Molina*, 17 F.4th at 741. "[B]ut for now, this was enough." *Id*.

Defendants only discuss *Molina* in a footnote about materiality. RB29 n.18. Here, defendants misconstrue the case by arguing that the defendant in *Molina* did not provide any of the required services for the capitated payments. That is irrelevant to the particularity analysis, and wrong to boot. The defendant in *Molina* lost its ability to provide Skilled Nursing Facilities services ("SNFist services" or "SNF services"), which were special care provided to nursing facility residents. 17 F.4th at 738. But it still provided *other* services to those beneficiaries (*e.g.*, paying for nursing facilities themselves). Molina was still liable for fraudulent inducement because it renewed a contract agreeing to provide SNFist services knowing that it could not provide them. *See id*. at 741. So too here: defendants renewed their certifications knowing they were not providing important services required by the federal standards and state law. JA59-60, JA103-108, JA117-119.

Defendants' other materiality arguments also fail. Mostly, defendants rest on the straw argument that they were not required to provide group therapy to every patient. RB26-27. As discussed *supra*, this

misconstrues Wheeler's allegations, which involve failure to provide any form of adequate therapy, as well as systematic fraudulent recordkeeping, implicating three separate conditions of certification.

More broadly, defendants have no convincing answer to Wheeler's explanation (at OB33-34) that materiality is holistic, encompassing factors including whether the government has identified a requirement as a condition of payment, whether the violations go to the essence of the bargain, how the government has responded to similar violations in the past, and whether the defendant covered up the violation—and how if even one of these factors weighs in favor of materiality, that suffices at the pleading stage. Wheeler explained how each of these factors supports materiality here, including with reference to the government's decision to intervene in a similar case in the District of Rhode Island. OB34-39, OB43-44.

After defendants' brief was filed, the district court in the Rhode Island case denied the defendants' motion to dismiss. *See United States ex rel. Quaresma v. Journey to Hope, Health & Healing, Inc.*, --- F. Supp. 3d ----, 2024 WL 1340920 (D.R.I. Mar. 29, 2024). As relevant here, the court explained that "treatment plans and counseling are central to" Medication Assisted Therapy. *Id*. at *7. Indeed, the court found "no question,

given the facts alleged," that the defendants' "violations went to the very essence of the bargain" with the government, and were therefore material. *Id*. at *5 (quotation omitted).

Defendants attempt to distinguish the Rhode Island case on its facts. RB27. With respect to failure to provide counseling and the falsification of records, the cases are indistinguishable; the only difference is that the defendants in Rhode Island also failed to update and record treatment plans. That distinction does not help defendants because the Rhode Island court never suggested that failure to provide counseling was immaterial on its own; instead, the court was clear that both treatment plans and counseling independently constitute material requirements. *See Quaresma*, 2024 WL 1340920, at *6. As the government explained (and as Wheeler alleges, JA91), counseling is necessary to prevent patients from relapsing. *See* OB36-37. Indeed, the non-drug services are what distinguishes OTPs from "mere drug dealers." OB36.

Defendants also block-quote a footnote from the decision below speculating that the government might not have wanted group therapy to occur during the COVID-19 pandemic. RB26. That is neither an allegation in the complaint nor a permissible inference from the allegations.

18

Instead, it is pro-defendant speculation, flatly impermissible at the pleading stage. It also rests on the flawed assumption that this case is only about failure to provide group therapy—which it is not.

Defendants repeat the district court's conclusion that compliance with the conditions of certification was not material. RB28. Wheeler responded by explaining that the specific requirements here go to the essence of defendants' bargain with the government. OB30-31. Defendants add nothing to the district court's flawed analysis.

Defendants accuse Wheeler of adopting "the facially overbroad position that '*all* of the federal opioid treatment standards are material to claims for payment for opioid treatment programs.'" RB29 (quoting OB43). As explained in the opening brief and *supra*, that position is not overbroad, and the Court should hold that all the treatment standards are material because they go directly to the value of the services the government pays for. In any event, defendants quote Wheeler out of context. In the quoted paragraph, Wheeler explained that although "it is at least plausible" that all of the federal opioid treatment standards are material, "the Court need not go so far to rule in Wheeler's favor" because even if *some* standards might not be material, the provision of adequate therapy,

which "is specifically identified as a required service, is name-checked in the relevant billing codes, is required by State law, and is a key element to the program's success," is a material requirement. OB43-44 (citations omitted). Defendants have no answer.

The bottom line is that defendants have no straight-faced argument that Wheeler has failed to *plead* materiality—or any other element—vis-à-vis fraudulent inducement.

## III.  The Complaint Pleads Implied False Certification.

The implied false certification claim is simple: It turns on the proposition that anybody reviewing defendants' claims for payment for opioid treatment services would have probably, but wrongly, believed that defendants had provided adequate therapy to their patients as required by law—which makes defendant's claims misleading, and therefore fraudulent under controlling law. OB43-44.

The opening brief explained that compliance with the federal opioid treatment standards, including especially the provision of adequate therapy services, is a material legal requirement. OB39-45. Wheeler further explained that the district court erroneously dismissed this claim by

focusing on the use of a bundled billing code instead of the import of the treatment standards. OB40-43.

Because defendants unceremoniously lumped fraudulent inducement and implied false certification together, most of the arguments in Part II, *supra*, apply with equal force to defendants' responses to the implied certification claim. For example, defendants fault the complaint for "not explaining how Acadia ever implicitly certified that they were providing group therapy to all patients when that was never required." RB24. Once again, this misconstrues Wheeler's allegations—which are not limited to failure to provide group therapy, but encompass failure to provide adequate therapy (group or individual), and to comply with other mandatory standards (*e.g.*, recordkeeping requirements). The same problem infects defendants' materiality argument, which again accuses Wheeler of inventing "a requirement for group therapy," RB30, rather than addressing her actual allegations.

Because none of defendants' responses have merit, this Court should hold that Wheeler pleads a claim for implied false certification based on violation of the federal opioid treatment standards.

## IV. The Complaint Pleads the Presentment of False Claims and Use of False Records With Particularity.

The opening brief explained that Wheeler's allegations satisfy Rule 9(b) by alleging a pattern of conduct that would necessarily have led to the presentment of false claims. OB49-62. Defendants' responses lack merit.

First, defendants argue that the complaint does not provide a representative example false claim. RB15-17. The opening brief never argued otherwise, so this contention is irrelevant. To be clear, the allegations relating to Patient 6 are part of the pattern of facts showing that false claims necessarily were submitted to the government. They satisfy that purpose by showing that defendants engaged in fraudulent conduct vis-à-vis a dual-eligible Medicare/Medicaid patient, and then billed the government for the affected services. *See* OB52-53. Although Wheeler does not have in hand the actual bills presented, the facts about Patient 6, combined with the complaint's allegations about defendants' billing practices, adequately allege that defendants billed Medicare for Patient 6's care. OB56-57.

Defendants never dispute that these allegations sufficiently plead that claims for Patient 6's care were necessarily presented to Medicare.

Instead, defendants argue that the claims for Patient 6 were not false because Medicare does not require the provision of group therapy and permits the use of bundled billing codes even when group therapy was not provided. RB16-17.

Defendants' argument does not address the fraudulent inducement and false certification theories described *supra*. In plain English, Wheeler alleges that Medicare would not have paid defendants for a patient who received inadequate therapy and whose health records had been blatantly falsified to reflect the provision of therapy that had never occurred—even if group therapy was not required. *See* JA117-118. If the Court finds those allegations adequate, defendants have effectively conceded that the complaint pleads the presentment of false claims to Medicare because defendants necessarily billed Medicare for the care of Patient 6, a patient for whom defendants created false group therapy notes in violation of core program requirements.

Because Wheeler pleads that false claims were necessarily presented to the government, *i.e.*, Medicare, the district court's decision dismissing this action must be reversed. The remaining questions only go to how large the case will be on remand, *i.e.*, to whether Wheeler's

allegations also state a claim vis-à-vis other government health programs, and vis-à-vis jurisdictions outside North Carolina.

Addressing these questions, the opening brief argued that relators need not identify specific patients for each affected government program, and that the scope of fraud is more appropriately a matter for discovery. OB57-59. Wheeler explained that this is the correct legal rule under this Court's precedents, which only require relators to present "some indicia of reliability" that false claims were presented—not an exhaustive catalogue of the evidence. OB58 (quoting *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 197 (4th Cir. 2018)). This rule also coheres with Rule 9(b)'s two purposes, which are to ensure that defendants have notice of the allegations against them and to weed out spurious claims. OB53-54. Once a relator has crossed the Rule 9(b) threshold—even with respect to one claim—both of these purposes are satisfied, and the scope of the defendant's liability should only be resolved after discovery. Otherwise, the well-recognized path for satisfying Rule 9(b) by providing an example false claim would make no sense.

Defendants do not answer these arguments on their own terms. Instead, they argue that Wheeler's complaint leaves open the possibility

that false claims were not submitted to other government programs, and therefore fails. RB17-20. Here, defendants stress language from this Court's decision in *Grant* saying that it is not enough when a relator's allegations "could have led" to presentment; they must instead have necessarily led to a false claim being submitted to the government. RB17 (quoting *Grant*, 912 F.3d at 198).

There are two major problems with defendants' legal argument. First, it ignores the fact that Wheeler has *already satisfied* the *Grant* standard by showing that false claims were necessarily presented to Medicare. None of this Court's precedents hold that a relator who has successfully alleged the presentment of false claims to the government must do so on a program-by-program basis—and defendants cite no authority for that proposition.

Second, defendants' proposed legal rule—which would scuttle a case, or part of a case, whenever any possibility exists that false claims were not presented to a specific payor—is too strict. They ignore important language from *Grant*, as well as this Court's decision in *United States ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc.*, 707 F.3d 451 (4th Cir. 2013), and its subsequent decision in *United States ex*

*rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185 (4th Cir. 2022). These cases make clear that the ultimate allegation that false claims were necessarily presented can be based on a "plausible inference," *Nathan*, 707 F.3d at 457, drawn from "circumstantial allegations," *Grant*, 912 F.3d at 198—and further hold that "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts," *Nicholson*, 42 F.4th at 195 (quotation marks omitted).

By ignoring key parts of the Court's prior holdings, defendants have concocted a legal rule that this Court never adopted requiring payor-specific allegations. Neither this circuit nor any other requires that level of specificity—and to do so would make the FCA effectively inaccessible to everybody outside a company's billing department, a result this Court expressly disclaimed in *Grant*. *See* 912 F.3d at 199 (explaining that the Court's "holding in no way" prevents "employees who do not have specific knowledge of a company's financial and billing structure . . . from adequately pleading FCA claims").

More broadly, defendants simply do not engage credibly with the precedents discussed in the opening brief. Thus, even though the application of Rule 9(b) is universally acknowledged to be a fact-sensitive exercise, defendants ignore important factual distinctions between this case and previous cases that have failed. For example, they ignore that the result in *Grant* turned in substantial part on the fact that the defendant was many steps removed from the entities that ultimately billed the government—which made the allegation that claims were presented less plausible. *See* OB50 (discussing *Grant*). Defendants also ignore a wall of precedents, including but not limited to this Court's decision in *Nicholson*, holding that Rule 9(b) should be applied in a purposive manner, and not used to dismiss cases where, as here, its purposes are satisfied. *See* OB53-54. Tellingly, defendants never argue that they lack notice of the allegations—and the well-substantiated allegations that defendants brazenly falsified therapy notes show that this is not the sort of spurious case Rule 9(b) seeks to weed out.

Defendants also essentially ignore the Fifth Circuit's decision in *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009), and its progeny, which held that when the presentment of claims is the

27

necessary conclusion of a defendant's fraudulent scheme, and the scheme is pleaded with particularity, Rule 9(b) is satisfied. OB55-57 (discussing *Grubbs* and its progeny). This Court described *Grubbs* as a case in which "specific allegations of the defendant's fraudulent conduct necessarily led to the plausible inference that false claims were presented to the government." *Nathan*, 707 F.3d at 457. The only time defendants discuss *Grubbs* is in a footnote offering purported factual distinctions. RB19 n.13. But the distinctions defendants hope to draw are baseless because here, as in *Grubbs*, the only way defendants' fraud could pay off is if they submitted claims to the government for the services they were claiming to provide— which makes an inference that claims were presented plausible here, just as it was in *Grubbs*.

Under the correct legal rule, Wheeler adequately pleads that false claims were presented to the government—including all its programs. This is because she alleges (1) systematic underlying fraud, *e.g.*, JA79-93; (2) a systematic practice of billing payors for services defendants claim to have rendered, *e.g.*, JA59-64, JA85, JA89, JA91, JA99-102; *and* (3) facts showing that claims necessarily were presented, *e.g.*, JA94-100. In response, defendants suggest that allegations based on "information and

28

belief" cannot satisfy Rule 9(b). RB19. That result is foreclosed by this Court's precedents, including *Grant*, which explains that a relator can satisfy the obligation to plead the presentment of false claims by alleging, "for instance, that upon information and belief, bills are routinely sent to the government" after services are provided. 912 F.3d at 199. These are exactly the sorts of allegations Wheeler made.

Defendants also argue that the complaint does not plausibly allege false claims outside North Carolina. RB20-21. But Wheeler alleges that the misconduct occurred nationwide, and that the use of false therapy notes—the key indicator of fraud—was dictated by corporate policy. JA91-93. The complaint also includes other examples of misconduct outside North Carolina that further bolster the allegation of nationwide fraud. JA64-67.

Defendants' authority is weak. They rely on one subsequently reversed district court decision, as well as another decision where the relator provided *no reason* for thinking the fraud was occurring nationwide. RB20. Here, however, Wheeler supplies insider knowledge that Matt Lawson, the Clinical Manager of defendants' Asheville facility, modified a falsified therapy note because "Corporate wants less detail," indicating

that national-level corporate defendants were directing the creation and use of false therapy notes. JA92. Wheeler also heard firsthand from the director of the North Wilkesboro facility about identical misconduct, showing that the fraud was not limited to the facility where Wheeler worked. JA92. And she explained that when she raised the issue with her supervisors, she was told to "stay in her lane." JA93. These facts support an inference that the same misconduct was occurring at all of Acadia's facilities. JA93. At the pleading stage, that is enough to satisfy Rule 9(b), even if some of the allegations are predicated on information and belief.

Tellingly, defendants have no answer to the argument that a ruling in their favor on this point would hobble the FCA vis-à-vis widespread frauds because only a handful of people will ever know *both* about the nationwide behavior *and* the specific practices leading to claims for payment. OB59-60. The Court should not adopt an interpretation of Rule 9(b) that protects the worst frauds from enforcement.

## V.  The Complaint Pleads Reverse False Claims.

Independently, defendants are liable for reverse false claims because they improperly avoided obligations to pay stipulated monetary penalties for CIA violations. *See* OB62-68. Specifically, defendants repeatedly breached the CIA by failing to provide required training and failing to report known reportable events, but falsely certified compliance with the CIA's training and reporting requirements. JA70, JA73-74, JA110-111, JA119-120. Under the CIA, stipulated penalties for these violations accrue "begin[ning] . . . on the day after the date the obligation became due." JA145. Defendants improperly avoided their obligation to pay penalties by failing to report their violations and filing false certifications, therefore violating the FCA's reverse false claims provisions.

Defendants first deny that the complaint identifies conduct that constitutes a breach of the CIA, RB31, but never discuss any of the foregoing allegations about training and reportable events. Crediting these allegations, as the Court must, the complaint pleads that defendants breached the CIA and accrued stipulated penalties; the government only needs to collect. *See* OB65-66.

Defendants argue next that the CIA's penalties are not "obligations" because the duty to pay them is contingent on government action. *See* RB30-33. Defendants' only justification for this interpretation is that more district courts have adopted it than have adopted Wheeler's view. RB32. But statutory interpretation is not a polling exercise, and the decisions defendants cite are neither binding nor persuasive. Tellingly, defendants never engage with the statutory text, nor explain why their reading is more consistent with the FCA.

Indeed, defendants do not even attempt to answer the opening brief's main arguments, including: (1) that the statutory definition of an "obligation," which includes duties "whether or not fixed," 31 U.S.C. § 3729(b)(3), covers at least some contingent obligations—as the legislative history makes clear by stating that the definition "expressly includes contingent, non-fixed obligations," S. Rep. No. 111-10, at 14 (2009), OB65; (2) the Tenth Circuit's decision in *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189 (10th Cir. 2006), which Congress cited approvingly when broadening the definition of "obligation," held that even if the government must act to collect an obligation, the obligation still gives rise to reverse FCA liability, OB67; and (3) if defendants'

interpretation were correct, it would be essentially impossible to bring reverse FCA claims based on contracts because *every* contract requires the nonbreaching party to take action to enforce it—a result that cannot be correct because the statutory definition expressly covers "express or implied contractual" obligations, 31 U.S.C. § 3729(b)(3); OB66.

Defendants say nothing about these arguments. The closest they come is to say that because the CIA provides that breaches "may lead to the imposition" of penalties, the language is too contingent to support a claim. RB33 (citing JA145). But the CIA also specifically provides—on the very same page—that penalties "shall begin to accrue on the day after the date the obligation became due" for violations of the training and reporting requirements. JA145. That mandatory contractual language, specific to the penalties at issue here, supersedes the more general umbrella language defendants cite.

More broadly, Wheeler acknowledges that certain obligations may be too contingent to support a reverse FCA claim. Defendants cite cases embodying such facts. *See* RB32. For example, in *United States ex rel. Schneider v. JPMorgan Chase Bank, N.A.*, 878 F.3d 309, 315 (D.C. Cir. 2017), the court found that penalties were too contingent to constitute

obligations when they would only accrue upon citation by an independent monitor, "failure to cure, failure of informal dispute resolution, and the filing of a suit in the district court"—and even then only at "the discretion of the district judge," as one of several potential remedies. And in *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1039-40 (5th Cir. 2016), the court held that "unassessed regulatory penalties are not obligations under the FCA"—but it acknowledged that "the fact that further governmental action is required to collect a fine or penalty does not, standing alone, mean that a duty is not established." As the court explained, what matters is whether the relevant law imposes a duty to pay money, or instead merely a general duty to obey the law. *See id.* at 1040.

Here, defendants do not dispute that if Wheeler's allegations are true, penalties are owed and the *only* prerequisite to penalties being paid is the government deciding to collect. In other words, the CIA does not merely impose a duty to follow the law; it also imposes a duty to pay for known violations. As Wheeler explained, such a duty is an "obligation" under the statutory definition. OB62-65. The reverse FCA claim should accordingly proceed.

# CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

s/Tejinder Singh

Gary W. Jackson
Kaitlyn E. Fudge
LAW OFFICES OF JAMES SCOTT FARRIN
555 S. Mangum St., Suite 800
Durham, NC 27701
Tel. (919) 688-4991

Willian N. Nettles
Frances C. Trapp
John L. Warren III
LAW OFFICE OF BILL NETTLES
2008 Lincoln St.
Columbia, SC 29201
Tel. (803) 814-2826

Tejinder Singh
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel. (202) 629-3530
tejinder.singh@sparacinopllc.com

*Attorneys for Plaintiffs - Appellants*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) because it was prepared in a proportionally spaced typeface using Microsoft Word New Century Schoolbook 14-point font.

I also certify that the brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6495 words, exclusive of the cover page, table of contents, table of authorities, certificate of counsel, signature block, and certificate of service.

s/Tejinder Singh
Attorney for Appellant

April 3, 2024

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system on April 3, 2024. I certify that, with one exception, participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

The one participant who is not a registered CM/ECF user has consented to service by e-mail. I certify that I served this brief by e-mail on Madeline Lea (mlea@ncdoj.gov), and a copy to her colleague Special Deputy Attorney General Steven McCallister (SMcCallister@ncdoj.gov).

s/Tejinder Singh
Attorney for Appellant

April 3, 2024
